# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL ANTHONY G. WILBERN, and WILBERN ENTERPRISES, LLC, | ) ) ) | No. 13 C 3269 |
| Plaintiffs, | ) ) | Judge Thomas M. Durkin |
| v. | ) ) ) | |
| CULVER FRANCHISING SYSTEM, INC., | ) ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Michael Anthony G. Wilbern ("Wilbern") and Wilbern Enterprises, LLC ("Wilbern Enterprises") sued Defendant Culver Franchising System, Inc. ("CFSI"), a Wisconsin corporation in the business of franchising the Culver's brand restaurant. Plaintiffs allege that CFSI engaged in a pattern and practice of racial discrimination in violation of 42 U.S.C. § 1981. Section 1981 prohibits racial discrimination in the making and enforcement of contracts, and "applies to all phases and incidents of the contractual relationship." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994).[1] CFSI has filed a series of motions, which have been

---

[1] The full text of the statute reads as follows:

### § 1981. Equal rights under the law

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like

fully briefed. For the reasons that follow, CFSI's motions are now denied, with the exception that Wilbern Enterprises' claim under Count II is dismissed.

## I.   BACKGROUND[2]

### A.   INITIATION OF BUSINESS DEALINGS BETWEEN PLAINTIFFS AND CFSI.

Wilbern is an African-American individual residing in Illinois. Wilbern Enterprises is an Illinois limited liability company organized by Wilbern for the purpose of owning and operating a Culver's franchise located in Franklin Park (the "Franklin Park Franchise"). Culver's restaurants offer burgers, sandwiches, salads, dinners, frozen custard desserts, beverages, and other menu items in a quick-service, casual dining setting. Craig Culver and other members of his family opened the first Culver's restaurant in Sauk City, Wisconsin in 1984. Today there are

---

punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

[2] The Court does not cite to the parties' Local Rule 56.1 Statements in this section for the reasons discussed later in this opinion. The facts referenced are taken from the record as a whole, and include a mixture of both disputed and undisputed facts, which are set forth for background purposes only.

approximately 501 Culver's restaurants in twenty-one states, most of which operate pursuant to franchise agreements between CFSI and independent franchise owners.

Wilbern lived in Wisconsin when he first became interested in becoming a Culver's franchisee. He had extensive prior operational experience running franchise restaurants, and got together with his friend Michael L. Jones ("Jones") to formulate an informal business plan whereby they would own and operate between them at least five and perhaps as many as ten Culver's restaurants. In pursuit of this plan, they met with Craig Culver and other CFSI officers and employees in April or May of 2002, and shortly thereafter completed CFSI's 16-week owner/operator training program. Jones then became the first African-American franchisee in Culver's system when he opened a franchise in Noblesville, Indiana in or about January 2003.[3]

### B. CFSI's Failure to Approve Franchising Opportunities on the Chicago South Side.

Wilbern started out his Culver's career as the general manager at the Noblesville franchise. Soon afterwards, however, he was asked by CFSI to provide support at a Culver's franchise located in Lansing, Illinois (owned by an unrelated party). Wilbern did so, and then continued to help CFSI at other franchise locations in Illinois while also scouting for various locations to open his own Culver's

---

[3] Jones and his company, MBAJ Group, LLC, also filed § 1981 claims against CFSI. Those claims originally were part of this same action until Jones moved to sever his case from Wilbern's case due to Jones' filing in Indiana of a petition in bankruptcy. The Court granted Jones' unopposed severance motion, and then stayed Jones' case during the pendency of the bankruptcy.

restaurant. Wilbern testified[4] that he informed Craig Culver and other CFSI employees or officers from the start of his desire to pursue a franchise located on the South Side of Chicago. By the end of 2003, Wilbern had identified several potential sites on the South Side of Chicago he believed would be good locations for a Culver's restaurant. Wilbern testified that, on multiple occasions from 2003 through 2012, he proposed the South Side sites he had identified to Tom Goldsmith, CFSI's Director of Development, as well as other CFSI officers or employees. In addition, he asked Goldsmith to help him find other South Side locations if CFSI did not like any of the three sites Wilbern had proposed. Wilbern also stayed in contact with the Chicago aldermen in whose wards the South Side sites were located. Wilbern understood and believed that the City of Chicago would provide tax increment financing ("TIF" funds) or other forms of support for any new Culver's restaurant opened at those sites. Wilbern believed that the availability of TIF and other public funds was significant to site-selection because, with this type of assistance, his costs of developing a new Culver's restaurant would compare favorably to other potential sites where public financial support was not available.

Wilbern testified that, despite his repeated requests, CFSI failed to approve any of the sites he selected, all of which were in predominantly African-American communities on the South Side of Chicago. CFSI did approve Wilbern for two franchises in the western suburbs of Chicago, however. First, CFSI approved

---

[4] Wilbern's testimony consists of both his deposition testimony and the affidavit he submitted in opposition to CFSI's summary judgment motions (R. 116-1). CFSI's motion to strike Wilbern's affidavit is discussed later in this opinion.

Wilbern in 2005 for the Franklin Park Franchise. Second, CFSI approved Wilbern in 2009 for a second franchise that was to be located in Hillside, Illinois. Wilbern never opened the Hillside franchise.

Wilbern testified that when he applied for both the Franklin Park and Hillside locations, he strongly preferred a South Side location and told CFSI as much. He testified that CFSI steered him away from a South Side location to the two west suburban locations, telling him that he had a better chance of receiving corporate approval for a franchise if he chose those west suburban locations. Wilbern testified that he went along with the Franklin Park location in 2005 because he did not want to rock the boat when his relationship with CFSI was just in its beginning stages. He stated that later, in 2009, he submitted an application for both a South Side location at Marshfield Plaza and the Hillside location, but that he submitted the application for Hillside only because Goldsmith urged him to select that location. CFSI approved the Hillside application, but did not take any action on the Marshfield Plaza application.

### C.   THE FRANKLIN PARK FRANCHISE.

Wilbern signed the Franchise Agreement on behalf of Wilbern Enterprises on November 29, 2005. The Franklin Park Franchise was doing well at first, but then began experiencing financial difficulties. Wilbern testified that those financial difficulties were caused by the higher-than-normal fixed costs at that location, which were largely due to a leasing arrangement with a company by the name of Milkshake, LLC ("Milkshake"). Milkshake purchased the land on which the

restaurant was situated and then leased it back to Wilbern Enterprises. Wilbern testified that he agreed to this arrangement at the urging of CFSI.[5]

Wilbern testified that two other factors also contributed to the Franklin Park Franchise's financial difficulties. Wilbern testified that Joe Femis, who held the position with CFSI of franchise business partner consultant, would not give his approval to raising food prices at the Franklin Park Franchise to off-set the higher-than-normal fixed costs at that location. In addition, CFSI allowed two other franchises to open within five or six miles from the Franklin Park Franchise. Wilbern testified that CFSI denied him the same benefits it routinely gave to other franchisees, which benefits included allowing a franchisee to set its own food prices and protecting an existing franchisee's market share from "cannibalization" of sales by a new franchisee.[6]

### D. WILBERN ENTERPRISES' BANKRUPTCY AND CFSI'S TERMINATION OF THE FRANCHISE AGREEMENT.

Eventually, the Franklin Park Franchise's financial difficulties led Wilbern to

---

[5] Milkshake is owned by Tim Nietzel, a Wisconsin real estate investor who has been involved in purchasing land for other Culver's franchises under the same type of lease-back arrangement.

[6] CFSI contends that its conduct on both these issues was in compliance with the terms of the Franchise Agreement, which provides that the franchisee has control over its food prices and grants the franchisee protection from the opening of a new franchise only if the proposal for the new franchise is within a three-mile radius of the current franchise. The two new franchises in question — Lyons and Rosemont — were more than three miles from the Franklin Park Franchise. Plaintiffs have submitted testimony from a restaurant industry expert, however, who will testify that CFSI has a past practice of not approving any new franchise — even one beyond the contractually protected radius — if the new franchise will encroach on the existing franchisee's sales, which Plaintiffs' expert will testify happened here.

seek help from CFSI. Wilbern testified that, at a meeting on September 13, 2010, Craig Culver verbally committed to providing Wilbern Enterprises with a lender guaranty. A guaranty from CFSI would have enabled Wilbern Enterprises to refinance its lease with Milkshake and thereby reduce its largest cost. Wilbern testified that Craig Culver lulled him into thinking he would receive support and financial assistance from CFSI, and that CFSI then engaged in a calculated scheme to string him along with misleading statements and empty promises while the Franklin Park Franchise continued to deteriorate financially. The guaranty never materialized, and, in May 2012, Wilbern Enterprises filed for protection under Chapter 11 of the Bankruptcy Code.

An exchange of emails on September 5, 2012 between Forrest Ingram, Wilbern Enterprise's bankruptcy attorney, and Steve Anderson, General Counsel for CFSI, supports Wilbern's claim that he continued to seek approval for a franchise on the South Side of Chicago even while the bankrupty proceeding was pending:

> Forrest,
>
> In furtherance of my telephone conversation with you earlier this morning, if Michael sells his interest in the Culver's franchise at Franklin Park, we would be open to considering him for another Culver's restaurant. However, before we would grant him another franchise he would have to go through the application process . . . . Michael's biggest hurdle will be whether he has enough liquid assets to start a new business, and we must be assured that his liabilities, including tax obligations, are not going to jeopardize the potential for success of such a business.
>
> Please call me if you would like to discuss this further.

Thanks,

Steven E. Anderson
General Counsel
Culver Franchising System, Inc.

Steve,

Mike has been in consultation with several alderman who
have indicated that they will GIVE him property (or sell it
to him for less than $5,000) if he will open a Culver's
business in a TIFF neighborhood that needs to have new
businesses so as to increase employment. Thus, he does
not need funds to pay rent or to purchase a building.

I have indicated to Mike that he can contact you directly
to submit the forms and to discover if there is anything
else that you require before Culver's will consider and
possibly grant him the new franchise.

Sincerely,

Forrest

R. 116-16 at 2-3.

Wilbern testified that he was led to believe by his communications with CFSI
such as the one above that support from CFSI was forthcoming even while the
bankruptcy proceedings were pending. He testified that no employee or officer of
CFSI ever told him during this time that CFSI would not support him, that CFSI
had denied his application for a franchise at Marshfield Plaza, or that CFSI would
never approve a franchise located on the South Side of Chicago. For these reasons,
Wilbern stated, he never contemplated suing CFSI during the bankruptcy; his focus
instead was on salvaging his franchise relationship with CFSI.

On October 10, 2012, the bankruptcy court dismissed Wilbern Enterprises'
Chapter 11 proceedings upon motion by the trustee. The bankruptcy court file

shows[7] that Wilbern Enterprises' two largest creditors (one of which was Milkshake) obtained relief from the automatic bankruptcy stay, which led the trustee to move to dismiss the Chapter 11 proceedings, or, in the alternative, to convert it to a Chapter 7 case, on the ground that reorganization was no longer feasible. The bankruptcy file does not reveal whether the bankruptcy court considered the trustee's alternative request to convert to a Chapter 7 proceeding. The bankruptcy court's dismissal order was without prejudice. *See* 11 U.S.C. § 349.

On November 30, 2012, Milkshake evicted Wilbern Enterprises from the Franklin Park premises. By letter dated the same day as the eviction, CFSI notified Wilbern Enterprises of its termination of the Franchise Agreement. Wilbern Enterprises received the termination letter sometime in the first week of December 2012. Not long after CFSI terminated the Franchise Agreement, Guy Hollis took over the Franklin Park Franchise. Hollis is white. At the time he took over the Franklin Park Franchise, Hollis already owned a Culver's franchise in Lyons, which is one of the two competing franchises that allegedly contributed to the demise of the Franklin Park Franchise. He also owned another Culver's franchise located in west suburban Berwyn.

### E.   PROCEDURAL HISTORY

The original complaint was filed on April 30, 2013. On August 2, 2013, CFSI filed a motion to dismiss, which this Court granted in part and denied in part. R. 41 (*Jones v. Culver Franchising Sys., Inc.*, 12 F. Supp. 3d 1079 (N.D. Ill. 2013)). The

---

[7] The Court may take judicial notice of the bankruptcy court file. *See United States v. Wood,* 925 F.2d 1580, 1582 (7th Cir. 1991).

Court's ruling on CFSI's motion to dismiss interpreted the original complaint as involving two types of § 1981 claims: (1) claims alleging racial discrimination in connection with the Franklin Park Franchise; and (2) claims alleging racial discrimination in connection with CFSI's failure to enter into other franchising agreements with Plaintiffs. *Id.* at 1084. The Court held that only Wilbern Enterprises could assert a claim based on the Franklin Park Franchise because the corporate entity, not the individual owner of that entity, was the contracting party under the Franchise Agreement. *Id.* at 1084. The Court held that as to claims relating to other potential franchise agreements, however, the original complaint's allegations viewed in the light most favorable to Plaintiffs were sufficient to state a claim on behalf of both Wilbern and Wilbern Enterprises. The Court noted that, should Plaintiffs ultimately obtain a jury verdict in their favor on this claim, CFSI could not be subject to double counting of damages. *Id.* at 1087-88.

After the Court ruled on CFSI's first motion to dismiss, Plaintiffs filed an Amended Complaint. The Amended Complaint incorporates the Court's previous ruling by separating Plaintiffs' § 1981 claims according to whether they concern discrimination with respect to an existing contractual relationship or discrimination in the formation of new contractual relationships. Thus, the first two counts of the Amended Complaint allege alternative § 1981 claims based on CFSI's alleged denial of new franchising opportunities -- Count I on behalf of Wilbern and Count II on behalf of Wilbern Enterprises. Plaintiffs' § 1981 claims based on the Franklin Park Franchise are alleged in Count III. Notwithstanding this Court's previous ruling on

CFSI's first motion to dismiss, Count III is alleged on behalf of both Wilbern and Wilbern Enterprises.

## II.   PRELIMINARY MATTERS

### A.   WILBERN'S COUNT III CLAIM ARISING OUT OF THE FRANKLIN PARK FRANCHISE AGREEMENT.

As a preliminary matter, CFSI makes the observation in one or more of its summary judgment briefs that this Court's prior ruling on CFSI's first motion to dismiss means that Wilbern's individual claim in Count III concerning the Franklin Park Franchise Agreement is not viable. R. 100 at 10 n. 3; R. 127 at 2-3. In its prior ruling, the Court held that Wilbern could not assert a  claim based on the Franklin Park Franchise because § 1981 provides a remedy only to persons who are parties to the contract. Here, only Wilbern Enterprises, not Wilbern, was a party to the Franchise Agreement. *See* R. 41 (*Jones*, 12 F. Supp. 3d at 1086-87 (citing *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006)).

After the Court entered its order on the first motion to dismiss, CFSI filed a counterclaim against Wilbern seeking to recover under a personal guaranty executed by him simultaneously with Wilbern Enterprises' execution of the Franchise Agreement. R. 46 at 35-36. Wilbern's personal guaranty provides that, in consideration of CFSI's execution of the Franchise Agreement, Wilbern guaranteed Wilbern Enterprises' payment to CFSI of amounts due under the Franchise Agreement, as well as Wilbern Enterprises' "performance of the covenants and obligations" in the Franchise Agreement. R. 46-3 at 31 (Personal Guaranty And Agreement To Be Bound Personally By The Provisions Of The Franchise Agreement

(Ex. D to Franchise Agreement)). The personal guaranty further provides that Wilbern is "personally bound by every provision contained in th[e] Franchise Agreement including the non-compete provisions," and that the personal guaranty would "be construed as though [Wilbern] executed a Franchise Agreement containing the identical provisions of this Franchise Agreement." *Id.*

The Court's previous ruling does not address the holding of *Domino's Pizza, Inc.* insofar as the Amended Complaint and Wilbern's personal guaranty are concerned. Nor have either CFSI or Plaintiffs ever addressed that question. Nevertheless, it is not entirely clear from the record whether Plaintiffs intend to pursue Wilbern's claim in Count III of the Amended Complaint. *Compare* R. 117 at 34 n. 9 (Pls. Mem. in Opp. to CFSI's Summ. Jud. Motions), *with* R. 136 at 4 (Pls. Resp. to Defs. Rule 56.1 Stmt., ¶ 12). Therefore, the Court directs Wilbern to file a position statement regarding whether he intends to pursue this claim. If he does, then he should provide the Court with citations to authority with appropriate analysis to support an argument that he suffered an injury distinct from any injury to Wilbern Enterprises, and that the injury he suffered flowed directly from racially motivated interference with rights *he* has under the guaranty agreement.

### B.   WILBERN ENTERPRISES' COUNT II CLAIM FOR DENIAL OF FUTURE FRANCHISING OPPORTUNITIES.

CFSI also observes in one or more of its filings that Wilbern Enterprises does not have a viable claim for denial of future franchising opportunities as alleged in Count II of the Amended Complaint. R. 127 at 2-3. CFSI acknowledges this Court's prior ruling upholding the alternative pleading of this claim, but contends that

discovery has now shown that this claim is invalid because Wilbern testified at his deposition he would not have used Wilbern Enterprises to open another Culver's franchise but instead would have created a new business entity to do so. *Id.*

The factual record is not entirely clear on this issue. On the one hand, Wilbern admits in his response to one of CFSI's Rule 56.1 statements that he "planned on creating a separate entity" for any "subsequent franchise agreement" on the South Side. R. 112 at 9, ¶ 24. On the other hand, Wilbern's deposition testimony supporting this admission was made with respect to Marshfield Plaza only. *See* R. 101-6 at 3 (Wilbern Dep. at 497). Wilbern did not testify about his intentions for any of the other franchising opportunities for which Plaintiffs seek to recover.

Nevertheless, the Court can resolve this issue based on the testimony of Plaintiffs' damages expert, John Gordon. Gordon's proposed testimony indicates that Plaintiffs' claims regarding denial of franchising opportunities include three potential franchise locations: (1) Stony Island (95th and Stony Island); (2) Marshfield Plaza; and (3) Chatham Market (83rd and Stewart). Based on this testimony as well as other evidence in the record the Court concludes that Plaintiffs' denial of franchising opportunities claims break down as follows:

*Stony Island:* Plaintiffs' lost opportunity claim based on Stony Island relates to Wilbern's desire to open a franchise there in 2005, when he allegedly was steered to the Franklin Park location instead of his preferred location at 95th and Stony Island. There is no evidence in the record that would support the view that Wilbern

13

would have opened a franchise at *both* Stony Island and Franklin Park at this time. Therefore, any lost profits that arise out of a hypothetical Stony Island restaurant are profits that Wilber Enterprises would have earned in place of income it either earned or lost at the Franklin Park location. Consequently, damages arising from lost profits from a hypothetical Stony Island franchise should be taken into account under Wilbern Enterprises' damages claims for alleged § 1981 violations in Count III of the Amended Complaint.

*Marshfield Plaza:* Plaintiffs' lost opportunity claim based on Marshfield Plaza relates to Wilbern's desire to open an additional franchise at this location after he already had opened the Franklin Park Franchise. The evidence shows that Wilbern sought to open a franchise at Marshfield Plaza through an entity other than Wilbern Enterprises. Accordingly, the claim for loss profits from a hypothetical franchise at Marshfield Plaza is a denial of franchising opportunity claim that can be asserted only by Wilbern pursuant to Count I.

*Chatham Market:* Plaintiffs' lost opportunity claim based on Chatham Market (83rd and Stewart) arises out of Gordon's theory, set forth in his expert report, that Wilbern would have been successful at the Marshfield Plaza location and that this success would have enabled him to open another franchise by the year 2014. In other words, the claim to recover lost profits associated with a hypothetical franchise at Chatham Market stems from Wilbern's denial of franchising opportunity claim based on Marshfield Plaza. Therefore, this loss, if it is recoverable, would be recoverable only by Wilbern pursuant to Count I.

In summary, Wilbern Enterprises does not have a viable claim for denial of franchising opportunities. Instead, it has a damages claim to recover lost profits that the Franklin Park Franchise might have earned had it been located at Stony Island instead of Franklin Park. This damages claim arises under Count III. Accordingly, Wilbern Enterprises' claim under Count II for denial of franchising opportunities is dismissed.

## III.   CFSI's MOTIONS TO STRIKE

### A.   WILBERN'S AFFIDAVIT.

At oral argument, the Court denied CFSI's motion to strike the affidavit filed by Wilbern in opposition to CFSI's summary judgment motions. The Court confirms that oral ruling for the reasons given in open court, but adds to those reasons the following discussion of the issues raised in CFSI's brief in support of its motion to strike.

CFSI invokes the "sham affidavit" rule, according to which "a plaintiff cannot manufacture an issue of fact by submitting an affidavit that contradicts prior sworn testimony." *McCann v. Iroquois Mem'l Hosp.,* 622 F.3d 745, 750-51 (7th Cir. 2010). The rule "is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *Id.* at 751 (citing cases). "But it applies when the change is incredible and unexplained. In contrast, when the change is plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory, a change in testimony affects only its credibility, not its admissibility." *Id.* (internal quotation marks and citations omitted).

In the few instances in which CFSI attempts to show inconsistency between

Wilbern's affidavit and Wilbern's deposition testimony, its efforts come up significantly short. CFSI seems to recognize this, and instead objects to Wilbern's affidavit mostly on the basis that it offers additional information and detail not provided in Wilbern's deposition testimony. There is no rule or principle of law, however, saying that a witness may not supplement the record with an affidavit providing additional information. In fact, Rule 56(c)(1) specifically contemplates such affidavits.[8] The only restriction on Rule 56(c)(1) is the "sham" affidavit rule, which Wilbern's affidavit does not violate.

CFSI asserts that Wilbern's affidavit nevertheless is somehow improper because it is "self-serving." The Seventh Circuit, however, has foreclosed that argument. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (internal quotation marks and citations omitted); *see also Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 459-60 (7th Cir. 2014) ("Self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment."), *cert. denied*, 135 S. Ct. 2892 (2015); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (seeking to "lay to rest the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a

---

[8] *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, *affidavits* or declarations, stipulations (*including those made for purposes of the motion only*), admissions, interrogatory answers, or other materials; . . .") (emphasis added).

summary judgment motion").

To be sure, all affidavits, including those of a party, must meet the usual requirements for evidence presented on summary judgment, such as the hearsay rule or the requirement of personal knowledge. *See, e.g., Widmar*, 772 F.3d at 460; *Payne*, 337 F.2d at 772. CFSI argues that some areas of Wilbern's affidavit raise these concerns. But it makes no effort to point out specifically which parts. Moreover, even if portions of Wilbern's affidavit violate an evidentiary rule, many of the statements in the affidavit are not relevant to any fact that is *material* to an issue raised in CFSI's summary judgment motions. If there is a valid evidentiary basis for discounting any material statement in Wilbern's affidavit, the Court will consider that issue when it addresses the summary judgment motion rather than in the context of ruling on a blanket motion to strike. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727-28 (7th Cir. 2006).

## B.   JOHN GORDON.

### 1.   OVERVIEW.

CFSI has filed a motion to strike the proposed testimony of Plaintiffs' expert witness, John Gordon. CFSI's motion is brought under Rule 702 of the Federal Rules of Evidence, which requires that expert testimony be (1) "help[ful] [to] the trier of fact to understand the evidence or to determine a fact in issue," (2) be "based on sufficient facts or data," (3) use "reliable principles and methods," and (4) "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme

Court charged trial judges with the responsibility of acting as gatekeepers to prevent irrelevant or exclude unreliable expert testimony from being admitted. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999), the Court clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science, and further held that the trial court has "wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable," *id.* at 152-53.

With these legal principles in mind, the Court turns to Gordon's expert testimony. Gordon is a restaurant industry analyst and management consultant with extensive restaurant operations and financial management experience. R. 137-40 at 5 (Gordon Report, ¶ 2). He is a certified Master Analyst of Financial Forensics (MAFF), who specializes in complex business analytical projects. *Id.* Gordon's proposed testimony covers issues relevant to liability and well as issues related to damages. The opinions he intends to give at trial, briefly summarized, include the following:

(a)    **95th and Stony Island** — Gordon will testify that: (1) beginning in 2006, Wilbern would have been successful at developing a franchise in the Stony Island Corridor on the Chicago South Side; (2) the reasons CFSI gave for not approving a franchise location in the Stony Island Corridor do not make sense from a business standpoint; (3) the Stony Island location was a better franchise location than the Franklin Park location; and (4) Plaintiffs suffered economic losses as a

result of CFSI's failure to approve a franchise in the Stony Island Corridor. R. 137-40 at 11-14.

**(b)   Franklin Park —** Gordon will testify that: (1) sales at the Franklin Park Franchise were detrimentally affected by CFSI's decision in 2009 to allow a competing franchise to open in Lyons, as well CFSI's decision in 2010 to allow another competing franchise to open in Rosemont; (2) CFSI's decisions in 2009 and 2010 to allow the opening of the Lyons and Rosemont franchises were inconsistent with past decisions or actions that demonstrate a "policy and practice of being concerned with the prospect of cannibalization of existing units"; and (3) the Franklin Park Franchise would have been marginally profitable over a twenty-five year period but for the "cannibalization" of its sales by the competing Lyons and Rosemont franchises. R. 137-40 at 14-23, 61-63.

**(c)   Marshfield Plaza —** Gordon will testify that: (1) beginning in 2007 through at least the end of 2010, Plaintiffs would have been successful at developing a franchise at Marshfield Plaza on the Chicago South Side; (2) CFSI's criticisms of the Marshfield site were unjustified from a business standpoint; and (3) Wilbern suffered economic losses as a result of CFSI's failure to approve a franchise at the Marshfield Plaza. R. 137-40 at 21-31, 64-84.

**(d)   83rd and Stewart —** Gordon will testify that: (1) Wilbern would have earned strong financial and cash returns had he been allowed to open at Marshfield Plaza; (2) these profits would have enabled Wilbern to add an additional franchise at another South Side location by the year 2014; (3) Wilbern would or could have

opened the additional franchise at Chatham Market, located at 83rd and Stewart; and (3) Wilbern suffered economic losses from his inability to expand to 83rd and Stewart in the year 2014 as a result of CFSI's refusal to allow Wilbern to open the Marshfield franchise. R. 137-40 at 31-32, 85-87.

**(e)   CFSI's Differential Treatment Of Plaintiffs And Variance From Standard Restaurant Franchise Practices** – Gordon will testify that Plaintiffs were treated differently than other franchisees and not in accordance with expected standard restaurant industry practices in terms of: (1) oversight of site selection process; (2) oversight of menu pricing; and (3) collaboration with a competing franchisee (Guy Hollis). R. 137-40 at 32-36.

### 2.   CFSI's Arguments Regarding Gordon's Liability Opinions.

The Court will begin its *Daubert* analysis with CFSI's arguments for excluding Gordon's expert opinions on liability issues. CFSI contends that Gordon's opinions on whether CFSI treated Plaintiffs in the same or a consistent manner as it treated white franchisees, and whether CFSI exercised best business practices in connection with how it treated Plaintiffs, should be barred for three reasons.

First, CFSI asserts that Gordon is not an expert in restaurant franchising or on franchisor-franchisee relations. In response, Plaintiffs point out that Gordon is a member of the American Association of Franchisees and Dealers, and that he has published numerous articles on topics involving restaurant franchises and chain restaurants. Plaintiffs further state that, of the seventeen representative sample engagements as an expert and consultant on restaurant industry legal matters listed

by Gordon on his CV, more than half concern franchisor-franchisee disputes. R.134 at 12.

CFSI takes issue with Gordon's qualifications primarily because Gordon admitted that "[he] has not received specific education or course work in franchising or any education through the International Franchise Association." R. 122 at 11. But "[t]he notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (rejecting argument that an "accountant should not have been permitted to testify as an expert witness because he does not have a degree in economics or statistics or mathematics or some other 'academic' field that might bear on the calculation of damages"). "Nothing in the text, purpose, or history of Rule 702 supports the notion that formal education or training is an indispensable prerequisite to a finding of testimonial competency. Indeed, the uncompromisingly plain language of the Rule refutes it." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1113 (N.D. Ill. 2005) (quoting Fed. R. Evid. 702, which provides that a witness may be qualified to as an expert "by knowledge, skill, experience, training, *or* education") (emphasis added); *see also Haager v. Chicago Rail Link, LLC*, 232 F.R.D. 289, 293 (N.D. Ill. 2005) (an expert's qualifications "need not be based on academic pedigree alone").

The Seventh Circuit has said that "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area."

*Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Moreover, experts may rely on their professional experience to offer opinion testimony regarding the standard of care and generally-accepted industry standards. *See WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (affirming admission of testimony by expert on real estate leases regarding customs in the commercial real estate industry).[9]

In its reply, CFSI appears to concede the more general point that Gordon is qualified to testify regarding franchise matters, but argues instead that none of the franchise articles written by Gordon relates specifically to the issue of whether one franchisee has been treated differently than another franchisee. This level of specificity, however, is not required. *See Loeffel Steel Prods., Inc.*, 372 F. Supp. 2d at 1113 ("An expert need not necessarily have specific experience with a particular facet of his or her expertise in order to be competent to testify as to that facet. A lack of specialization generally does not affect the admissibility of the opinion, only its weight.") (internal quotation marks and citations omitted). In sum, the Court finds

---

[9] *See also Baldonado v. Wyeth*, 2012 WL 3234240, at *3, 5 (N.D. Ill. Aug. 6, 2012) (denying *Daubert* challenge to expert who would opine that defendant "did not do what a reasonable pharmaceutical company should have done," where expert "[brought] to bear her experience and training on the issue"); *In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices & PMF Prods. Liab. Litig.*, 2011 WL 6740391, at *12 (S.D. Ill. Dec. 22, 2011) (plaintiffs "may ask a witness, who has familiarity with other pharmaceutical companies, if that witness is familiar with custom and practice in the industry," and may also ask witness whether defendant's "action comported with that industry standard"); *Fed. Ins. Co. v. Arthur Andersen, LLP*, 2006 WL 6555232, at *3 (N.D. Ill. Jan. 18, 2006) (permitting expert testimony on insurance industry's custom and practice of claims handling); *Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 903-04 (N.D. Ill. 2001) (testimony on the "general standards of care in the industry" comes from the expert's professional knowledge, and is "classic expert testimony").

that Gordon is qualified to render the expert opinions as outlined in his report relating to restaurant franchising, franchisor-franchisee relations, industry customs and best practices, and the disparate treatment of Plaintiffs vis a vís other Culver's franchisees.

CFSI next argues that Gordon's testimony concerning disparate treatment is not based on sufficient facts or data. According to CFSI, Gordon "cherry picks" two white franchisees (Hollis and Obriecht) to use as comparators, while ignoring evidence showing that Plaintiffs were not treated any differently than many franchisees other than Hollis and Obriecht. CFSI misperceives the scope of the "sufficient facts and data" component of Rule 702. To be sufficient, Rule 702 requires only that "there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). This standard, by its terms, is not restricted to a purely numerical inquiry. Thus, while the quantity of data considered by the expert may be relevant to establishing the necessary link, it is relevant only insofar as it bears on the question of whether the expert has employed an appropriate methodology, and this question, in turn, depends on the nature of the matter on which the expert is opining. *See Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 808 (7th Cir. 2013) ("Rule 702's requirement that expert opinions be supported by 'sufficient facts or data' means 'that the expert considered sufficient data to employ the methodology.'"), *quoting Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (observing by way of illustration that an opinion about an average gross sales

price could not be reliably supported by evidence relating to sales to only one customer "because a single observation does not provide a sufficient basis for calculating an average").

In this case, Gordon's testimony is offered on the issue of discrimination in treatment among franchisees. "'Discrimination among franchisees means that as between two or more similarly situated franchisees, and under similar financial and marketing conditions, a franchisor engaged in less favorable treatment toward the discriminatee than toward other franchisees.'" *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, 2015 WL 2124994, at *5 (S.D. Ind. May 6, 2015) (quoting *Canada Dry Corp. v. Nehi Beverage Co. of Indianapolis*, 723 F.2d 512, 521 (7th Cir. 1983)). The location of the franchises owned by Hollis and Obriecht, and the similarities of their situations as compared to Wilbern, [10] establish a reasonable basis for Gordon to have chosen those franchisees as comparators. *See Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) ("The similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether there are enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.") (internal quotation marks and citation omitted). CFSI makes various arguments regarding additional franchisees who Gordon did not consider in his analysis, but those arguments go to the weight of Gordon's testimony not to its admissibility.

---

[10] Hollis owns a Culver's franchise in west suburban Lyons and Berwyn. Obreicht was approved after this lawsuit was filed to open the first Culver's restaurant in Chicago, specifically, in the predominantly white Wrigleyville neighborhood.

Finally, CFSI asserts that Gordon's testimony regarding CFSI's failure to exercise best practices or conform to industry standards "is misguided" because "[t]his case has nothing to do with whether CFSI's site selection process was sophisticated or even consistent with the industry standard." R. 152 at 7. Instead, CFSI argues, this case is "about whether CFSI applied [its] principles and policies, regardless of quality or sophistication, evenly across franchisees." *Id.* CFSI is correct insofar as the ultimate issue in the case is concerned, but incorrect regarding the relevancy of the proposed expert testimony. The testimony is relevant to the issue of pretext. A reasonable jury might conclude from this expert testimony that the reasons CFSI gave for the conduct of which Plaintiffs complain were not the real motivating factors for that conduct. The remaining points argued by CFSI on this issue once again go to the weight to be given to Gordon's testimony and not to its admissibility. Indeed, CFSI has basically provided an outline of what its cross-examination of Gordon should be. Again, these are issues that "hinge on credibility assessments and issues of fact that must be resolved by a jury." *Andy Mohr Truck Ctr., Inc.*, 2015 WL 2124994, at *5.

### 3.   CFSI'S ARGUMENTS REGARDING GORDON'S DAMAGES OPINIONS.

As a precursor to testifying about Wilbern's lost profits damages, Gordon is prepared to testify that Wilbern would have been able to open a South Side franchise had CFSI not denied him the opportunity to do so. CFSI challenges at least two factual assumptions on which Gordon's testimony on this point is based — the

assumption that Wilbern would have received TIF funds[11] to use as equity towards the costs of building a South Side franchise, and the assumption that Wilbern would have been able to negotiate a lease at Marshfield Plaza. In addition, CFSI challenges Gordon's opinions regarding the causes of the decline in sales at the Franklin Park Franchise. The Court will address each of these issues separately.

### (a)    The TIF Assumption.

CFSI asserts that Gordon is not an expert in TIF funding, and that he therefore should be disallowed from "providing any opinions or testimony that in any way relate to TIF or assume the presence of TIF as a precursor to lost profits." R. 122 at 10. CFSI's focus on Gordon's lack of expertise in the area of TIF funding, however, misstates the relevant inquiry. The guiding legal principles are found in Federal Rule of Evidence 703, which states as follows:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially

---

[11] The City of Chicago's official website describes TIF as follows:

> "Tax Increment Financing (TIF) is a special funding tool used by the City of Chicago to promote public and private investment across the city. Funds are used to build and repair roads and infrastructure, clean polluted land and put vacant properties back to productive use, usually in conjunction with private development projects."

http://www.cityofchicago.org/city/en/depts/dcd/provdrs/tif.html.

outweighs their prejudicial effect.

Gordon was entitled to assume that the TIF funds would have been available as a "fact" in the case. As the court explained in *Richman v. Sheahan*:

> If an expert could not base his opinion on [factual] assumptions — which in turn is based on testimony — there could be little meaningful and informative expert testimony in any case in which there was a divergence of testimony. The question is not whether the opinion is based on assumptions, but whether there is some factual support for them. If there is not, they are by hypothesis unreliable and inadmissible. If there is, it is for the jury, properly instructed, to determine the credibility of the witnesses and thus the weight to be given to the expert opinion.

415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) (citation and footnote omitted).

Experts routinely opine based upon factual assumptions given to them. *Id; MediaTek inc. v. Freescale Semiconductor, Inc.*, 2014 WL 971765, at *2 (N.D. Cal. Mar. 5, 2014) (defendant's argument for "the wholesale elimination of the background sections upon which Lawton bases her damages calculations . . . is either patently frivolous or fundamentally misunderstands the nature of expert testimony at trial"). The proponent of the expert bears the burden of persuading the jury that the underlying facts for the expert's opinion exist. For this reason, "a seasoned trial attorney will not even attempt to call the expert to opine at trial until the evidence underlying the opinion has actually been admitted." *MediaTek inc.*, 2014 WL 971765, at *2. Nevertheless, the validity of the expert's factual assumptions is not the focus under a pre-trial *Daubert* inquiry. In performing its gatekeeping function, this Court's primary concern is with "the validity of the methodology employed by an

expert." *Manpower, Inc.,* 732 F.3d at 806. "The soundness of the factual underpinnings of the expert's analysis" is a "factual matter[] to be determined by the trier of fact." *Smith,* 215 F.3d at 718. As the Supreme Court explained in *Daubert,* "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

In accepting the factual assumption that Wilbern would have received TIF funds for the South Side franchises in question, Gordon relied on, among other things, Wilbern's testimony that the various aldermen and city officials with whom he met "consistently offered to support the development of a Culver's unit [in the South Side of Chicago] via the [TIF] program." R. 137-40 at 11 (Gordon Report, ¶ 16). Wilbern's testimony in and of itself was sufficient to support Gordon's factual assumption regarding the availability of TIF funds. *See Tuf Racing Prods.,* 223 F.3d at 591 (rejecting challenge to admission of C.P.A.'s earnings projections even though those projections were the product of financial information furnished by the plaintiff and the plaintiff's counsel). "That the expert accountant in *Tuf* could opine on future earnings on the basis of information supplied *by counsel* should make clear that the reliability of the data itself is not the object of the *Daubert* inquiry." *Manpower, Inc.,* 732 F.3d at 808 (emphasis in original). Whether Wilbern's testimony ultimately is admissible at trial is not the issue on a pre-trial *Daubert* inquiry. Under Rule 703, Gordon was permitted to rely on Wilbern's testimony even if it would not be admissible at trial.

This is not to say that an expert opinion is *never* subject to a pre-trial challenge based on the lack of factual support. But in considering such a challenge, the Court must determine *only* whether Plaintiffs have "some" evidence to support Gordon's factual assumptions. *Richman*, 415 F. Supp. 2d at 942. Plaintiffs clearly have met that standard here. In addition to considering Wilbern's testimony, Gordon also conducted his own independent investigation on the TIF issue in which he consulted numerous other sources of data.[12] Thus, this is not a case in which an

[12] Gordon reviewed the following depositions and declarations: (1) Deposition of Carrie Austin, Alderman for the 34th Ward (Marshfield Plaza), who testified that she is "100 percent sure" Wilbern would have received TIF funding for a Culver's at Marshfield Plaza, R. 125-17 at 25; (2) Deposition of Chester Wilson, Alderman Austin's Chief of Staff, who confirmed Alderman Austin's testimony, R. 125-18 at 45-52, 57; (3) Declaration of Howard Brookins, Alderman for the 21st Ward (Chatham Market), who stated that he has "substantial discretion as to how all TIF funds are used in [his] ward (¶ 6), that he is "very confident" he "would have been able to find sufficient TIF and/or other funds for a new Culver's restaurant [at 83rd and Stewart]," and that "this project was more than doable" (¶ 8), R. 152-21 at 3-4; (4) Declaration of Michele Harris, Alderman for the 8th Ward (Stony Island), stating that "[t]here [was] no doubt in [her] mind" that she "would have been able to support" Wilbern to get a Culver's restaurant built in her ward, including finding "TIF or other funds that would be needed to close any gap between what" Wilbern "had available and what was needed to acquire the site and build the restaurant" (¶ 10), R. 125-24 at 3; and (5) Declaration of Todd Stroger, former Alderman of the 8th Ward (Stony Island), stating that he "is virtually 100% positive that anyone opening a new Culver's restaurant" at any site in the Stony Island corridor between 2001 and 2006 "would have received TIF or other incentives from the City" (¶ 6), and that "[i]t would have been virtually unprecedented" for the Chicago City Council to have rejected a funding request for "this type of development when it received the Alderman's support, which [he] would have given unequivocally" (¶ 10), R. 125-23 at 3-4. In addition, Gordon relied on other, independent sources of data, including what appears to be an analysis Gordon prepared from publicly available information concerning TIF appropriations and committed uses of those funds to assess whether the various alderman actually could have made good on their promises of TIF funds. R. 125-5 at 26, 64-65 (Gordon Report,¶ 41 and Ex. 6). Gordon also relied on (1) "a summary of the State of Illinois Code relative to TIF"; (2) data about Berwyn where "eight different restaurants [were] funded via TIF"; (3) "a

expert makes assumptions that are unsupported by any evidence. *See, e.g., Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3rd Cir. 2000) (reversing jury verdict because district court failed to exclude expert opinion regarding amount of plaintiff's lost economic opportunities based on assumption that plaintiff could have earned over $12,000 a year but for her injury, where plaintiff failed to adduce evidence at trial that she could have obtained employment at those wages). Indeed, CFSI has not offered *any* contrary evidence on the TIF issue. But even if it did, that would not change the Court's analysis, because "it is clear that [Gordon] d[id] not assume these facts without any basis." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009). Nor, for that matter, did Gordon "rely on a single data point, or on a subset of data that was plainly insufficient to support" his methodology. *Manpower, Inc.*, 732 F.3d at 808-09. As a result, any evidence CFSI might have offered in an effort to contradict Gordon's conclusions would not have been "pertinent to [the Court's] *Daubert* examination." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. at 165.

Faced with support in the record for Gordon's assumption that TIF funds would have been available, CFSI's speculation argument has evolved from being focused on the TIF assumption in general to being focused on the more specific assumption that TIF funds would have been available on a "100%, up-front, lump sum" basis, as CFSI defines that term. R. 152 at 1. CFSI contends that Gordon's

---

PowerPoint presentation," which he attached to his supplemental report; and (4) research he did "via the law firm of Polsky & Associates," which "has a robust website of TIF reports, TIF articles, and the like." R. 125-9 at 24 (Gordon's Dep. Day 3).

damages opinions depend on a "100%, up-front, lump sum" assumption, and that this assumption is speculative because none of the witnesses who Plaintiffs potentially may present at trial to establish the availability of TIF funds testified to payment terms of "100%, up-front, lump sum" funding.

Initially, the Court notes that the witnesses to whom CFSI refers were not deposed, or else they were deposed but CFSI did not ask them about "100%, up-front, lump sum" TIF funding. Therefore, the Court cannot say what their testimony on that issue would be. Moreover, CFSI's argument overlooks the fact that Gordon filed a supplemental report that opines Wilbern would have been able to obtain financing to begin the project even without receiving the TIF funds on a "100%, up-front, lump-sum" basis. *See* R. 137-41 at 8-11 (Gordon Supp. Report, ¶¶ 11-18). CFSI challenges Gordon's supplemental opinion on this issue, but does not make any specific argument regarding either Gordon's expertise or methodology in rendering that opinion.[13] The Court cannot say based on the current record that Gordon does not have a sufficient background in restaurant financing to be able to render an expert opinion regarding the availability of lender financing based solely on the promise of TIF funds.

In any event, even if the Court looked only at Gordon's original expert opinion, and even if that original opinion included the factual assumption of "100%, up-front, lump sum" funding as defined by CFSI, that factual assumption appears to the

---

[13] CFSI merely challenges one data input Gordon looked at in rendering that financing opinion, but even if that data input were otherwise inadmissible at trial, as CFSI contends, CFSI has not made any argument that it is not of the type on which experts in the field typically rely. *See* Fed. R. Evid. 703.

Court to be sufficiently based on existing data, or, at the very least, on an extrapolation from existing data. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data."). In making the analytical connection between availability of TIF funds in general and availability of a sufficient amount of TIF funds disbursed in a manner to have allowed Wilbern to finance the project, Gordon properly could have relied on the data cited in a previous footnote. In addition, he might have relied on the facts and other data set forth in either the deposition or expert report of Plaintiffs' second expert (now withdrawn), Zeb McClaurin. CFSI's arguments against reliance on McLaurin's expert *opinions* (which the Court addresses next), even if accepted, would not bar Gordon's reliance on the facts and data to which McLaurin testified because CFSI has made no argument that those facts and data are *not* of the type on which experts in the field typically rely. *See* Fed. R. Evid. 703.[14]

_____

[14] CFSI suggests that McLaurin testified that "100%, up-front, lump sum" TIF funding was "unprecedented." The Court has reviewed the cited testimony, however, and does not agree with CFSI's characterization of it. The most that can be said is that in McLaurin's own experiences with receiving TIF funds, McLaurin has not received those funds in the exact manner described by CFSI. But McLaurin also testified that, even though he had never sought and obtained TIF funds in the manner CFSI described, in his opinion it was possible Wilbern could have. In any event, even if McLaurin's personal view supported CFSI's "unprecedented" argument, that would be beside the point. CFSI argues that Gordon may not rely on McLaurin's expert *opinions*, and that argument, if accepted, would also mean that *CFSI* cannot rely on those opinions either. Setting aside McLaurin's expert opinions, the issue is whether the facts or data to which McLaurin testified (as opposed to his expert opinion) would support a factual assumption of "100%, up-front, lump sum" TIF funding. From the Court's own review of McLaurin's deposition testimony, it appears that the facts to which McLaurin testified are ambiguous on that issue, but that they do appear to provide some basis for Gordon to extrapolate to a "100%, up-front, lump sum" TIF funding assumption.

In short, even if Gordon has to rely, as CFSI argues, on a "100%, up-front, lump sum" TIF assumption, the Court does not believe that Gordon's expert opinions fall into the category of "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Nor does the Court think that "there is simply too great an analytical gap between the data and the opinion proffered" by Gordon. *Id.* Perhaps a "100 percent, up-front, lump-sum" TIF assumption makes Gordon's testimony less compelling. But "[t]he fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible." *Stollings,* 725 F.3d at 768.

The last issue raised by CFSI's challenge to Gordon's damages testimony — which is in fact the central focus of CFSI's *Daubert* challenge — relates to the testimony of McLaurin. The Court did not begin its analysis with a discussion of McLaurin because his testimony is mostly irrelevant to the Court's *Daubert* review of Gordon's proposed damages testimony given all the other sources of data on which Gordon can rely for the TIF funding assumption. Nevertheless, the Court will address CFSI's arguments concerning McLaurin. Plaintiffs originally designated McLaurin as an expert witness who was expected to testify at trial to his opinion that Wilbern was likely to have received TIF funding if he had been granted a franchise on the Chicago South Side. McLaurin's expert opinion was derived from his own experience as a developer of Chicago real estate and recipient of TIF funding. In preparing his original report, Gordon consulted with McLaurin on the TIF issue. According to CFSI, McLaurin's expert opinions on TIF funding have been

"discredited" because Plaintiffs withdrew their expert designation of McLaurin after he was confronted during his deposition with evidence of a past legal problem. This legal problem did not relate to the area on which McLaurin was expected to testify, but it nevertheless reduced his appeal as a witness in a jury trial.

CFSI argues that Gordon's consultation with McLaurin somehow taints Gordon's damages opinion. But it is difficult to understand why that would be so. To begin with, it is inaccurate to say that Plaintiffs' withdrawal of McLaurin based on his diminished appeal as a witness in a jury trial had the result of "discrediting" McLaurin's opinions regarding the likelihood of TIF funding being available to Wilbern. CFSI does not argue that McLaurin is *not* an expert on TIF. Nor has CFSI made any attempt to raise an evidentiary challenge to either his expert opinions or the facts on which those opinions are based. Therefore, there is no basis for saying that Gordon could not rely on his consultation with McLaurin on the TIF issue, along with the various other sources he examined on that issue, before reaching the conclusion that Wilbern likely would have received TIF funds, and then using that factual assumption to formulate his own expert opinion that Wilbern would have been able to open a South Side franchise.

The concern raised by Gordon's consultation with McLaurin is the possibility that Gordon will be testifying to another, non-testifying expert's opinion. In general, however, Rule 703 permits an expert to rely on the opinions of other experts in a related field. The case cited by Plaintiffs in support of this principle is *United States v. 1,014.16 Acres of Land*, which states that "[a]n expert cannot be an expert in all

fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion." 558 F. Supp. 1238, 1242 (W.D. Mo. 1983), *aff'd,* 739 F.2d 1371, 1373 (8th Cir. 1984) (per curiam). CFSI discounts this case because it was decided by a federal district court in another district. But the principle for which Plaintiffs cited that case is one that is widely accepted, including by the Seventh Circuit. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) ("*Dura*") ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert; and it is apparent from the wording of Rule 703 that there is no general requirement that the other expert testify as well.") (emphasis omitted).

Despite the general rule, however, *Dura* held that there are limits to this kind of expert testimony, particularly where the "soundness of the underlying expert judgment is in issue." *Id.* In that situation, a testifying expert may not offer an opinion that "parrot[s] the opinion" of a non-testifying expert. *Id. Dura* cited *In re James Wilson Associates*, 965 F.2d 160, 172-73 (7th Cir. 1992), for this proposition, which held, according to *Dura*, that a testifying expert could "use what the [non-testifying expert] told him to offer an opinion within the [testifying expert's] domain of expertise, but he could not testify for the purpose of vouching for the truth of what the [non-testifying expert] had told him — of becoming in short the [non-testifying expert's] spokesman." *Id.* (internal quotation marks and citation omitted).

Here, Gordon did exactly what *Dura* and *In re James Wilson Associates* say he

can do. He used what McLaurin told him to form his opinion that Wilbern would have been able to open a franchise located in the South Side of Chicago. Gordon may not — and Plaintiffs say they do not intend to offer him to — vouch for McLaurin's *opinion* that TIF funds would have been available to Wilbern. This means that Gordon can neither testify directly about McLaurin's expert opinion that TIF funds would have been available, nor give his own opinion to the same effect. He cannot do the latter because he admits he is not qualified to offer his own expert opinion on the subject, and therefore he would only be "vouching for" the expert opinion of McLaurin.

But these limitations do not lead to the result CFSI seeks here – which is a ruling disqualifying Gordon from testifying to the expert opinions he *is* qualified to make. In *Dura*, the plaintiff's testifying expert did not have the expertise to render an opinion on the contested fact issue and the non-testifying experts on whom the testifying expert had relied were all disqualified from testifying based on the plaintiff's failure to disclose their names in a timely manner. So far, *Dura* is similar to this case, in that Gordon is not qualified to give an expert opinion regarding the availability of TIF funds and McLaurin, who is qualified on that issue, has been withdrawn and so will not be testifying. But in *Dura*, the factual assumption was scientific in nature and could *only* be established through expert testimony; therefore, the disqualification of the experts on whom plaintiff's testifying expert relied meant there was a failure of proof on a factual assumption that was essential to the testifying expert's opinions. Here, on the other hand, there is some ambiguity

in the record whether availability of TIF funds is even an essential factual component of Gordon's expert testimony. But assuming it is, CFSI has not made any showing that expert testimony is *required* to establish the availability of TIF funding (notwithstanding that Plaintiffs originally sought to provide expert opinion evidence on the issue). And, as discussed, there is ample non-expert evidence in the record to support the underlying fact that TIF funds would have been available. Therefore, there is no failure of proof on Gordon's factual TIF assumption.

Finally, CFSI argues that because Plaintiffs have withdrawn McLaurin as an expert witness, "[t]here is no way for CFSI or this Court to test or assess the reliability of McLaurin's opinions." R. 122 at 11. This assertion is based on the premise that Gordon will somehow be vouching for McLaurin's expert opinion, which the Court already has explained is not the case. CFSI is free to test or assess *Gordon's* opinion that Wilbern would have been able to open a South Side franchise. Under Rule 705, "an expert may state an opinion — and give the reasons for it — without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination." Thus, CFSI may explore on cross-examination the extent to which Gordon's opinion depends on the assumption that TIF funds would have been available. Theoretically, in doing so, CFSI could open the door for Gordon to testify about McLaurin's opinions. But since that testimony would violate the principles outlined in *Dura*, the remedy is for the Court to limit Gordon's testimony regarding the sources of data on which he relied to the sources other than McLaurin's expert opinion.

**(b)     The Marshfield Lease.**

CFSI also challenges the factual assumption that Wilbern would have been able to negotiate a lease at Marshfield Plaza. CFSI's arguments in this regard are based on deposition testimony which shows that Wilbern encountered some unresolved issues in negotiations with the Marshfield Plaza landlord. CFSI says that this evidence shows that Wilbern would not have been able to negotiate a lease. Wilbern, on the other hand, says that he stopped negotiating with the landlord before the issues were resolved because he did not get approval for the Marshfield location from CFSI. Had he gotten approval, Wilbern contends, he would have been able to resolve the issues with the landlord and ultimately sign a lease.

Whenever an issue in a case revolves around a hypothetical situation such as "what would have happened," the inquiry "necessarily involves an element of approximation and uncertainty." *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 1737951, at *2 (N.D. Cal. Apr. 8, 2015) (internal quotation marks and citation omitted); *see Fishman v. Estate of Wirtz,* 807 F.2d 520, 550 (7th Cir. 1986) ("plaintiff is given an exceedingly difficult task: quantifying the difference between what actually happened and what would have happened in a hypothetical free market"). That is not a reason, however, to say that Wilbern's version of "what would have happened" is speculation. The generally accepted legal principle to be applied in this situation is that, "[w]here the defendant's wrong has caused the difficulty of proof of damages, he cannot complain of the resulting uncertainty." *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1365 (7th Cir. 1996) (internal quotation

marks and citation omitted); *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 383 (7th Cir. 1986) ("Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.") (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)), *cert. denied*, 480 U.S. 934 (1987).

The Court would be usurping the role of the jury were it to conclude that CFSI's view of the evidence and inferences to be drawn therefrom should prevail as a matter of law. CFSI's argument that Gordon's damages testimony is speculative because the evidence is controverted on whether Wilbern would have been able to negotiate a lease is an argument CFSI must make to the jury.

### (c)   The Causes Of The Franklin Park Franchise's Demise.

Lastly, CFSI challenges Gordon's opinions on the causes of the decline of Wilbern's sales at the Franklin Park Franchise, arguing that those opinions are not based on sufficient facts and data. CFSI does not challenge Gordon's methodology. Instead, CFSI's arguments center on the quantity and types of data used by Gordon for his analysis. CFSI repeatedly states that Gordon "disregards" certain evidence which CFSI believes is more important than the evidence on which Gordon does rely. At the same time, CFSI ignores the evidence that would support Gordon's conclusions.

For instance CFSI points to evidence showing that in 2007 and 2008, Wilbern began to experience problems paying his food supplier. From this fact, CFSI seeks to draw the conclusion that the Franklin Park Franchise's financial problems had

nothing to do with CFSI's approval of competing franchises in 2009 and 2010. Plaintiffs, on the other hand, point out that CFSI approved Wilbern for another franchise in 2009. They draw the conclusion from this evidence that the financial problems Wilbern was having in 2007 and 2008 were not so serious that his financial viability was threatened, at least not until 2009 and 2010 when CFSI approved the competing franchises. Neither of these competing conclusions is compelled by the evidence. In another example, CFSI points out that the Franklin Park Franchise, the Lyons franchise, and the Rosemont franchise have all remained in business since Wilbern's default. From this evidence, CFSI concludes that Wilbern's default did not have anything to do with CFSI allowing the Lyons and Rosemont franchises to open. But CFSI fails to acknowledge that the Franklin Park Franchise is now owned by the same person (Hollis) who owns the Lyons franchise (as well as another west suburban franchise in Berwyn). Therefore, sales from all three of these franchises went into a single pocket. From this, a jury might conclude that the Lyons franchise did have a "cannibalization" effect, but that the effect did not impact the bottom line of the new Franklin Park franchise owner (Hollis) in the same way that it did Wilbern Enterprises' bottom line.

The point of these examples is not to argue the evidence. It is instead to show that what CFSI is really challenging is not the lack of sufficient facts or data on which Gordon's methodology relies but rather the *conclusions* Gordon draws from the data. "Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions

those methods produce — that is, whether the conclusions are unimpeachable." *Stollings,* 725 F.3d at 765. CFSI's arguments are material to cross-examination, but they are not a basis to bar Gordon's testimony. "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc.*, 732 F.3d at 806. CFSI's arguments are not properly resolved by this Court under *Daubert*; therefore, its motion to strike Gordon's testimony is denied.

## IV.   CFSI's MOTIONS FOR SUMMARY JUDGMENT

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.    THE PARTIES' LOCAL RULE 56.1 FACT STATEMENTS.**

Before proceeding to CFSI's summary judgment motions, the Court must pause to address the parties' Local Rule 56.1 Fact Statements.  The Court allowed CFSI to file separate motions for each issue it wished to raise on summary judgment. That now regretted decision led to a morass of Local Rule 56.1 filings – twelve separate documents, totaling close to 300 pages with a combined total of almost 500 paragraphs of purported "undisputed" facts in support of summary judgment and additional facts in opposition thereto. Aside from sheer volume, these filings violated the letter and spirit of the Local Rule in multiple ways, but most egregiously by bombarding the Court with factual and legal arguments that are outside the purpose of Rule 56.1 statements. *See Sys. Dev. Integration, LLC v. Computer Sciences Corp.*, 739 F. Supp. 2d 1063, 1068 (N.D. Ill. 2010), *amended in part on other grounds,* 2011 WL 1311903 (N.D. Ill. Apr. 1, 2011); *Malec v. Sanford*, 191 F.R.D. 581, 584-85 (N.D. Ill. 2000). As a result of both parties' noncompliance,[15]

---

[15] CFSI correctly points out that a large portion of the problem is attributable to Plaintiffs' two statements of additional facts filed pursuant to Local Rule 56.1(b)(3)(C). Absent prior leave of Court, a respondent to a summary judgment motion may file no more than 40 separately-numbered paragraphs of additional facts. *See* Local Rule 56.1(b)(3)(C). One of Plaintiffs' statements contains 177 paragraphs, and the other contains 83 paragraphs. Moreover, many of the paragraphs in both statements of additional fact contain five or more separate subparagraphs, and long excerpts from deposition testimony and Wilbern's affidavit. It was virtually impossible for CFSI to properly respond to these paragraphs in accordance with the procedures of Local Rule 56.1. Further, no purpose is served by copying the deposition and affidavit word for word into the statements. Fact statements should contain "specific, concrete, and particularized" factual statements. *De v. City of Chicago*, 912 F. Supp. 2d 709, 713-14 (N.D. Ill. 2012). Moreover, they should reflect only facts that are *material* to the movant's motion. *Id.; see Cimber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Instead of extracting from the affidavit and depositions the specific, concrete and

the Court has chosen to mostly disregard the fact statements and conduct its own review of the record. In addition, the Court now makes clear, in case there is any doubt, that no further summary judgment motions will be entertained in this matter.

---

particularized facts needed to decide CFSI's summary judgment motions, Plaintiffs frustrated CFSI's ability to respond in a proper manner and "burden[ed] an already burdened judicial system." *Greer v. Bd. of Educ. of City of Chic.*, 267 F.3d 723, 727 (7th Cir. 2001). Given Plaintiffs' violations of Local Rule 56.1, CFSI would have been more successful had it moved to strike Plaintiffs' two statements of additional facts rather than Wilbern's affidavit. The statements were improper; the affidavit was not. But that does not mean CFSI was itself in compliance with Local Rule 56.1. Of particular note is CFSI's response to Plaintiffs' statements of additional facts. CFSI further compounded its error of moving to strike Wilbern's affidavit by giving a general denial to many of the paragraphs in Plaintiffs' statements followed by a citation to its motion to strike. CFSI did this even in response to paragraphs in Plaintiffs' statements of additional facts that were specific, concrete, and particularized and thus *not* in violation of the Local Rule. CFSI also gave other inappropriate responses, such as to deny the "characterization, summarization, and interpretation of the cited testimony," or to admit that the cited deposition testimony was accurately reported by Plaintiffs but to deny its substance on the ground that CFSI "has insufficient knowledge to admit or deny." These responses are purely argumentative. *See Malec*, 191 F.R.D. at 584. CFSI's own statements of undisputed facts also were not in full compliance with Local Rule 56.1. For example, they contain paragraphs that are argumentative and not supported by the record citations provided. *See, e.g.,* R. 98 at 3-4 (Def. Stmt., ¶¶17, 23). In addition, they contain statements telling the Court only what Plaintiffs alleged in their complaint, as opposed to what the record shows the facts to be. CFSI says that its purpose was to "assume" the allegations of the complaint were true and argue it was still entitled to summary judgment. But summary judgment is based on all the evidence in the record. *See* Fed. R. Civ. P. 56(c)(1). By its approach, CFSI was ignoring the actual record, which included evidence clarifying, expanding upon, or contradicting the allegations in the complaint in respect to issues raised by CFSI in its summary judgment motions. Nor did Plaintiffs' response help to enlighten the Court on what the record actually showed as to those issue. Because of the way CFSI worded its factual statements, Plaintiffs' response merely admitted that the statements accurately reflected what the complaint said. The end result was pages and pages of factual posturing and argument by both parties designed more to obscure than to aid the Court in its summary judgment task.

### C.     SUMMARY JUDGMENT ON TIME-BARRED CLAIMS.

CFSI argues that if Plaintiffs allegations regarding the discriminatory events on which their claims are based are "tak[en] as true," summary judgment is proper because there are no disputed fact issues regarding when those events occurred. R. 100 at 1. Based on those dates, CFSI argues that all of the alleged discriminatory events in Count I are time-barred, and that all of the alleged discriminatory events in Count III also are time-barred with the exception of the alleged discriminatory events occurring after April 30, 2009 as alleged in paragraphs 82-90, and paragraph 111(e)-(g) of the Amended Complaint. R. 99 at 3; R. 100 at 2 n. 1.

### 1.     WHICH STATUTE OF LIMITATIONS APPLIES?

The Supreme Court held in *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660-64 (1987), that federal courts should borrow the state statute of limitations applicable to personal injury claims for § 1981 claims. In Illinois, personal injury claims are governed by the two-year statute of limitations in 735 ILCS § 5/13-202. Three years after *Goodman,* Congress enacted 28 U.S.C. § 1658, which establishes a catch-all, four-year statute of limitations for federal statutes enacted after December 1, 1990. After 28 U.S.C. § 1658 was enacted, the question arose whether § 1981 was a federal statute "enacted after December 1, 1990" in order for 28 U.S.C. § 1658 to apply. The answer to that question was not clear because § 1981 originally was enacted in 1866, but was amended in 1991. The Supreme Court answered that question in *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). *Jones* held that 28 U.S.C. § 1658 did not apply to § 1981 claims relating to contract formation,

because those claims "arise under" subsection (a) of § 1981, which was part of the statute as originally enacted in 1866. *Id.* at 382. *Jones* held that 28 U.S.C. § 1658 *did* apply to claims arising out of existing contractual relationships — *i.e.,* relating either to contract termination or to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" — because those claims "arise under" subsection (b) of § 1981, which was added to the statute by the 1991 amendments. *Id.*

Thus, Wilbern's claim in Count I is governed by the two-year statute of limitations of 735 ILCS § 5/13-202 because it is a subsection (a) claim relating to contract formation. Count III, on the other hand, which concerns the Franklin Park Franchise, is governed by the four-year statute of limitations of 28 U.S.C. § 1658 because those claims are subsection (b) claims relating to contract termination and "the enjoyment of all benefits, privileges, terms, and conditions of [an existing] contractual relationship." 42 U.S.C. § 1981(b).

### 2. WHEN DID PLAINTIFFS' § 1981 CLAIMS ACCRUE?

The next issue is "the ever vexing question of when the statue of limiatios begins to run in a discrimination case." *Webb v. Indiana Nat'l Bank*, 931 F.2d 434, 435 (7th Cir. 1991); *see Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) ("Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date — often the same, but sometimes later — on which the plaintiff discovers that he has been injured."), *cert. denied*, 501 U.S. 1261 (1991). While the parties make a number

of different arguments, basically, CFSI's position is that accrual occurred on the date that each of the alleged discriminatory events took place, while Plaintiffs argue that accrual was delayed on all of their § 1981 claims until the date on which CFSI terminated the Franklin Park Franchise.

Accrual is a question of federal law regardless of whether 28 U.S.C. § 1658 or 735 ILCS § 5/13-202 provides the applicable statute of limitations. *See Wallace v. Kato,* 549 U.S. 384, 388 (2007) ("the accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law").[16] Applying the approach followed in this Circuit, the proper way to analyze the question is to first identify the injury, and next determine the date on which Plaintiffs could have sued for that injury. *See Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004) (citation omitted). Then, the Court should look to see whether the date on which Plaintiffs could have sued for the injury coincides with the date Plaintiffs knew or should have known their rights were violated. *Id.* Plaintiffs have alleged one type of injury in Count I and another type of injury in Count III. Because "the precise injury" is "critical" to a proper determination of when a cause of action accrues, *id.*, Count I should be analyzed separately from Count III.

### a.   Count I — Denial of Franchising Opportunities.

The injury Wilbern allegedly suffered under Count I is the denial of a franchising opportunity. CFSI argues that this injury occurred on two occasions.

---

[16] The standards of proof for discrimination claims under § 1981 are generally the same as those applicable to § 1983 (and also Title VII) cases. *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010).

The first was on November 29, 2005, when the parties executed the Franchise Agreement, because that is when Plaintiffs allegedly were steered to the Franklin Park location and away from the Stony Island location Wilbern preferred. The second was on September 9, 2009, when CFSI approved the Hillside location but not the Marshfield Plaza location.

As noted earlier, Plaintiffs' damages theory related to Stony Island does not state a denial of franchising opportunity claim. Instead, that damages theory relates to Wilbern Enterprises' claim under Count III that it was denied the opportunity to select the location of a franchising opportunity it was granted. As such, Wilbern Enterprises' claim based on Stony Island is really a denial of contractual benefits claim related to the Franklin Park Franchise. That claim, therefore, falls under the statute of limitations analysis in the next section.

The second denial of franchising opportunities claim relates to Wilbern's application to open a franchise at Marshfield Plaza. CFSI seeks to apply the "discrete discriminatory acts" rule enunciated by the Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), to this claim. In *Morgan*, the Supreme Court held that a "discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Id.* at 110. The Court rejected the notion that Congress' use of the term "unlawful employment *practice*" in Title VII was intended to "convert[ ] related discrete acts into a single unlawful practice for the purposes of timely filing." *Id.* at 111. Thus, the Court concluded, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period if

a discrete discriminatory act occurs on a day that is outside the statute of limitations." *Id.* at 112. Rather, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113.

CFSI contends that the alleged denial of a future franchising opportunity based on Wilbern's application for Marshfield Plaza occurred on the date that CFSI approved the Hillside application, which was September 9, 2009. The problem with this analysis is that Wilbern's application for a franchise at Marshfield Plaza, which Wilbern submitted at the same time as the Hillside application, was never denied by CFSI. In fact, there is evidence that the Marshfield Plaza application was still under consideration by CFSI as late as September 5, 2012, as shown by the email exchange between Wilbern Enterprises' bankruptcy attorney and CFSI's general counsel. R. 116-16 at 2. In *Webb,* the Seventh Circuit considered whether a plaintiff could "resuscitate a stale claim [of discrimination] by asking for reconsideration." *Webb,* 931 F.2d at 436 (internal quotation marks and citation omitted). The Seventh Circuit held that where the later decision is an "inevitable consequence of the earlier determination," then the statute of limitations begins to run from the date of the earlier determination. *Id.* at 437. But where the earlier decision is "a decision on *that* application, not for all time — or the plaintiff neither knew nor should have known that it was a decision for all time, then the statute of limitations did not start to run then." *Id.* (emphasis in original). In short, "[o]nly if the defendant has made clear that the plaintiff will not receive further consideration is the plaintiff on notice of a permanent exclusion — a freeze, a ceiling on advancement, parallel to a

denial of tenure — that starts the statute of limitations running on any future job applications." *Id.*

*Webb* was decided before the Supreme Court's opinion in *Morgan,* but recent decisions support that it is still good law. *See, e.g., Smith v. Potter,* 445 F.3d 1000, 1007 (7th Cir. 2006) ("[t]he Supreme Court has consistently instructed that, in determining when [a discrimination claim] accrues, the proper focus is upon the time of the *discriminatory acts*," and the Seventh Circuit "has expanded on that framework, essentially creating a two-prong test to determine the date of an unlawful employment practice: (1) there must be a final, ultimate, non-tentative decision to terminate the employee, and (2)  the employer must give the employee unequivocal notice of its final termination decision") (internal quotation marks and citations omitted) (emphasis in original), *overruled in part on other grounds, Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). Under *Webb*, Wilbern's denial of franchising  opportunity claim based on Marshfield Plaza did not accrue on September 9, 2009 because Wilbern was not told at this time that his application for that location was denied.

In addition, the Seventh Circuit's opinion in *Stuart v. Local 727, Int'l Brotherhood of Teamsters*, 771 F.3d 1014 (7th Cir. 2014), also supports the application of *Webb* here and further serves to distinguish *Morgan*. The plaintiff in *Stuart* was a female professional driver who wanted to drive vehicles ferrying equipment and persons involved in movie and television productions. *Id.* at 1016. Those jobs, however, were available only upon referral by the local union. *Id.*

49

Accordingly, in March 2010, the plaintiff joined the local union and submitted a referral application. *Id.* at 1017. For the following year and a half, the plaintiff waited but never received a referral from the union. *Id.* In October 2011, believing that the local union had an unwritten policy or practice of only referring males, the plaintiff filed a charge of sex discrimination with the EEOC and timely filed suit in December 2013 after receiving her right to sue letter. *Id.* at 1017. The district court dismissed the plaintiff's complaint, finding that her EEOC charge was untimely because, even though she had alleged at least one failure to refer within the statute of limitations, she had alleged other failures to refer outside of the statute of limitations and also other specific things that showed she knew about the discrimination against women by the local union since at least 2005. *Id.* at 1017-18.

According to the Seventh Circuit, the district court erroneously believed that, in order to state an actionable discrimination claim, *Morgan* required the plaintiff to allege a specific refusal of a request to be hired within the limitations period. *Id.* at 1019. The Seventh Circuit disagreed, however, and held that an allegation of a "failure to refer," as opposed to a specific refusal to hire, stated a legally cognizable discrimination claim. *Id.* (quoting *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 349 (3d Cir. 1990), which stated that "courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer"). Of particular note here, the Seventh Circuit held that a failure to hire/failure to refer discrimination claim

"was not a situation contemplated by the decision in the *Morgan* case." *Id. Morgan,* the Seventh Circuit said, did not establish a rule that, in order to allege a discrimination claim, a plaintiff was *required* to allege a discrete discriminatory act. *Id.* Imposing such a requirement, the Seventh Circuit said, "would open a large gap in Title VII," *id.* at 1020, as demonstrated by the following hypothetical the court gave:

> Suppose a woman applies for a job as a crane operator on construction sites, a traditionally male job. The employer has an ironclad but of course undisclosed rule of never hiring women for such jobs. A woman applies and the employer tells her it has no openings now but will notify her as soon as there is one; but in fact the employer has decided that, pursuant to its policy, it will not notify her of any openings. 301 days go by and the employer informs her: "Ha ha; we don't hire women; you'll have to file your EEOC charge yesterday if you want to sue us."

*Id.*

The same hypothetical would read here: Wilbern applies for a franchise at Hillside and also for one at Marshfield Plaza, and is told only that he can open a franchise at Hillside. No action is taken on the Marshfield Plaza application, although there are discussions between the parties where Wilbern is told that CFSI is still "open" to granting him another franchise. In fact, however, if Plaintiffs' allegations are believed, CFSI has already decided, pursuant to its secret discriminatory policy, that it will never approve Wilbern for the Marshfield Plaza. CFSI waits until two years and a day after it granted the Hillside application and then tells Wilbern, "sorry, we have a policy against Culver's franchises being located in African-American neighborhoods; you'll have to file a discrimination claim

yesterday if you want to sue us."[17]

Wilbern states in his affidavit (and other evidence in the record supports) that: (1) CFSI never formally denied Wilbern's request for a franchise at Marshfield Plaza; (2) as far as Wilbern knew, the entire City of Chicago was open for Culver's franchises; (3) CFSI had no official policy against opening restaurants in African-American neighborhoods; (4) no one from CFSI ever explicitly told Wilbern the entire South Side of Chicago was off-limits; and (5) Wilbern was led to believe, through various communications with CFSI personnel taking place as late as September 5, 2012, that Wilbern's request for the Marshfield Plaza site was still under consideration by CFSI. It does not matter that there are other instances in the record of CFSI's failure to approve a franchising opportunity on the South Side of Chicago that extend back to a time outside the limitations period. "There is no rule that a plaintiff who has been repeatedly discriminated against by her employer cannot challenge any of the discriminatory acts" unless he files suit within the statute of limitations "after the first such act." *Stuart,* 771 F.3d at 1018; *see also Morgan,* 536 U.S. at 113 ("The existence of past acts and the employee's prior

---

[17] This hypothetical is more analogous to the facts in this case than the "repeated assault" hypothetical CFSI's counsel relied on at oral argument. Counsel's hypothetical was to assume that, for a ten-year period, one person repeatedly assaults another person. In that situation, there is a cause of action for each time the attacker harms the victim. If the victim decides not to file suit until the ninth year, and all that has happened from the ninth year forward is the attacker spit on the victim, then the victim can recover damages for the attacker spitting on him, but cannot recover damages for all the other attacks that occurred outside the statute of limitations. Counsel's hypothetical clearly involves a discrete act (an assault), whereas Plaintiffs' denial of franchising opportunities claim, as discussed above, does not.

knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed."); *Webb*, 931 F.2d at 437 ("A defendant cannot by virtue of its history of discrimination against an employee prevent that employee from complaining about new discriminatory acts.").

The Court has found no evidence in the record, let alone undisputed evidence, of a formal or even an informal denial by CFSI of Wilbern's application for the Marshfield Plaza location. Moreover, even if there was a formal denial of that application in 2009, the record shows that CFSI told Wilbern in 2012 it was still open to considering him for a South Side franchise. Wilbern was never "authoritatively informed," *Webb*, 931 F.2d at 437, that he would never receive approval for the Marshfield franchise. Therefore, CFSI's decision approving the Hillside application was not final with respect to the Marshfield application, and the statute of limitations did not begin to run on the Marshfield application. CFSI did not put Wilbern on notice of a "permanent exclusion," *id.,* until it terminated the Franklin Park Franchise. At that time, Wilbern either knew or should have known that he would receive no further consideration for a South Side franchise. Wilbern filed this lawsuit approximately four months after receiving the termination letter, which was well within the applicable two-year statute of limitations of 735 ILCS § 5/13-202. Therefore, Wilbern's Count I claim for denial of franchising opportunities is timely.

**b.    Count III — Discriminatory Treatment Concerning The Franklin Park Franchise.**

The § 1981 injury Plaintiffs allege in Count III of the Amended Complaint is two-fold. First, there is an injury arising from the termination of the Franchise Agreement. Second, there is an injury arising from the denial of the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" ("denial of contractual benefits injury"). The Court holds that Count III is not barred by the statute of limitations regardless of which of these two injuries is the injury for which Plaintiffs seek recovery.

First, Plaintiffs' discriminatory termination claim involves a discrete act under *Morgan*. That act occurred on the date that Plaintiffs received notice of the termination, which was the first week of December 2012. Accordingly, a cause of action alleging injury resulting from the termination would not expire until four years later, which was the first week of December 2016. Plaintiffs timely filed suit before that date. Moreover, CFSI misperceives the reach of the "discrete act" rule when it argues that it is entitled to summary judgment on Plaintiffs' "allegations" relating to events that occurred outside the four-year statute of limitations measured from the date of termination. *Morgan* "does not 'bar an employee from using the prior acts [that fall outside the statute of limitations] as background evidence in support of a timely claim.'" *Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014) (quoting *Morgan*, 536 U.S. at 113)). All of the conduct and events alleged in the Amended Complaint appear to be relevant to Plaintiffs' timely filed discriminatory

termination claim;[18] therefore, CFSI is not entitled to summary judgment on those allegations.

Second, the statute of limitations analysis regarding Plaintiffs' injuries arising out of CFSI's alleged denial of contractual benefits, when evaluated under *Morgan's* discrete discriminatory acts rule, is not as straight-forward as the analysis applicable to Plaintiffs' injuries arising out of CFSI's alleged wrongful termination. CFSI seems to just assume, however, that the discriminatory acts alleged by Plaintiffs in support of their denial of contractual benefits claim are "discrete acts," and then argues the statute of limitations consequences of applying that label. CFSI's result-oriented approach ignores the case law giving meaning to the term "discrete act."

A discrete discriminatory act is something that is itself actionable. *See Wallace,* 549 U.S. at 388 ("it is the standard rule that [accrual occurs] when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief") (internal quotation marks and citations omitted). A plaintiff cannot sue until "the wrongful act or omission results in damages." *Id.* at 391. Therefore, prior knowledge of discrimination is irrelevant for purposes of the statute of limitations if the plaintiff has not yet suffered an injury for which he can sue. *See* Webb, 931 F.2d at 436 (rejecting argument that the plaintiff should have sued years before the discriminatory acts of which she complained since it was then

---

[18] Whether there is a separate evidentiary objection to prior acts outside the statute of limitations is dealt with by motions in limine before trial, not in a summary judgment context.

that she discovered the defendant did not treat blacks as well as whites, stating: "[y]ou cannot be forced to sue before you are injured" and "you can't, of course, sue for damages until you have been injured").

Applying this basic principle immediately disposes of at least one of CFSI's arguments. CFSI cites to the allegation in the Amended Complaint that, while attending the Culver's franchise training session, Wilbern felt unwelcome, was excluded from conversations, and was otherwise isolated. CFSI claims that a § 1981 claim based on this allegation is time-barred because the training session took place in 2002, eleven years before this lawsuit was filed. CFSI's analysis falters, however, because this allegation does not allege a discrete discriminatory act. The training session occurred three years before the Franchise Agreement was executed. Therefore, even though Wilbern said he felt discriminated against at this event, neither Wilbern Enterprises nor Wilbern could possibly have suffered the injury of which they complain in Count III – a denial of contractual benefits – because the contractual relationship was not even in existence yet. Without a compensable injury, Plaintiffs could not have filed a § 1981 lawsuit against CFSI, and this is true regardless of whether Wilbern admitted at his deposition that he felt discriminated against at the training session.

To decide whether the remainder of Plaintiffs' allegations that form the basis of their denial of contractual benefits claim are "discrete discriminatory acts," the Court looks for further definitional assistance. In *Morgan*, the Supreme Court said that discrete discriminatory acts include things like "termination, failure to

56

promote, denial of transfer, or refusal to hire." *Morgan,* 536 U.S. at 114. A discrete act of discrimination, therefore, "is like a termination, a failure to promote, or [a] refusal to hire," in that it "is easily identifiable" and "its occurrence can be pinpointed in time." *Hildebrandt v. Ill. Dept. of Nat'l Resources*, 347 F.3d 1014, 1028 (7th Cir. 2003) (quoting *Inglis v. Buena Vista Univ.*, 235 F. Supp. 2d 1009, 1023 (N.D. Iowa 2002)). Conversely, an act is not a discrete discriminatory act if its occurrence is difficult to pinpoint in time. *See Dooley v. Abbott Labs.*, 2009 WL 1033600, at *6 (N.D. Ill. Apr. 17, 2009).

"[W]hen an employer makes employment decisions over time that make it difficult for the employee to determine the actual date of discrimination," the continuing violations doctrine applies. *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707 (7th Cir. 2002), *cert. denied*, 538 U.S. 944 (2003). "The office of [the continuing violations doctrine] is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought. It is thus a doctrine not about a continuing, but about a cumulative, violation." *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008). The proto-typical case in which the continuing violations doctrine applies is a hostile work environment/sexual harassment case. *See id.* ("The first instance of coworker's offensive words or actions may be too trivial to count as actionable harassment, but if they continue they may eventually reach that level and then the entire series is actionable. If each harassing act had to be considered in isolation, there would be no claim even when by virtue of the cumulative effect of the acts it was plain that the

plaintiff had suffered actionable harassment.") (citing *Morgan*, 536 U.S. at 117). But courts have applied the continuing violations doctrine outside the hostile work environment/sexual harassment context as well, even after *Morgan*, where the plaintiff's claim is composed of a series of separate acts that collectively constitute one unlawful employment practice. *See, e.g., Turley v Rednour*, 729 F.3d 645, 651 (7th Cir. 2013) (applying continuing violations doctrine to an Eighth Amendment claim where "prison officials repeatedly and regularly imposed lockdown for improper purposes, and with each continuing day and period of lockdown, [the plaintiff's] injuries increased"); *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 269 (7th Cir. 2009) (applying continuing violations doctrine in case alleging union engaged in "multi-faceted and ongoing slowdown campaign" causing injury to airline, where "the defendants engaged in unlawful actions before and during the limitations period that caused injuries before and during the limitations period," the "earlier actions shed light on the actions within the limitations period," and "the earlier actions that continued into the limitations period combined with actions well within the period to create new injuries").[19]

   Here, Plaintiffs' denial of contractual benefits claim involves on-going acts that combined to cause injury to Plaintiffs and for which it is difficult to pinpoint

---

[19] CFSI cites to *Burkes v. McDonald's Corp.*, 1997 WL 28300 (N.D. Ill. Jan. 21, 1997), but in that case, the franchisee alleged a discrete, one-time decision by the franchisor refusing to grant the franchisee permission to sell his franchise. That is a very different situation from the one here, which involves a series of initially trivial acts that ultimately escalated to an unlawful course of conduct. While not every § 1981(b) claim necessarily involves a series of separate acts that collectively constitute one unlawful employment practice, Plaintiffs' § 1981(b) denial of contractual benefits claim in this case does.

the exact moment when the discrimination occurred. These on-going courses of conduct include CFSI's alleged wrongful failure to provide financial assistance, CFSI's alleged failure to protect Wilbern Enterprises from harmful competition, and CFSI's alleged pressuring to maintain lower prices than Wilbern wanted to set. The alleged wrongful steering leading to the Franklin Park site selection also falls into this category, but could be said to have ended no later than the date on which the Franchise Agreement was executed, which was in November 2005. Plaintiffs filed suit outside the four-year statute of limitations from that date, but Wilbern was just entering into a relationship with CFSI at this time and therefore should not be expected to have identified and sued for discriminatory steering at that moment. *See Johnson v. Nyack Hosp.*, 891 F. Supp. 155, 165 (S.D.N.Y 1995) (statute of limitations should not be applied in a way that requires a plaintiff to bring suit during "the continued existence of a close and important relationship that reasonably may be regarded as making the commencement of litigation inappropriate or unduly costly in human terms").

Had Plaintiffs sued immediately in response to any of the issues raised by their denial of contractual benefits claim, they would have run the risk of "infuriat[ing] [CFSI] by complaining about what might be an inconsequential act of discrimination that [they] did not expect to be repeated." *Stuart,* 771 F.3d at 1018; *see also Webb*, 931 F.2d at 437 (the law should not require a plaintiff "to sue at the drop of a hat"). While CFSI relies on the discovery rule,[20] that rule does not apply

---

[20] Under the discovery rule, the statute of limitations begins to run as soon as a

where a plaintiff would have difficulty initially recognizing that his legal rights had been violated. In the latter situation,"[i]f the victim of [discrimination] sues as soon as the [discrimination] becomes sufficiently palpable that a reasonable person would realize [he] had a substantial claim [of discrimination], then [he] sues in time and can allege as unlawful conduct the entire course of conduct that in its cumulative effect [amounts to actionable discrimination]." *Limestone Dev. Corp.*, 520 F.3d at 801.

The Court holds that none of the alleged wrongful acts identified in Count III that occurred prior to CFSI's termination of the Franchise Agreement were sufficiently decisive so as to have enabled Plaintiffs to realize that they suffered a compensable injury, and to have imposed the burden on Plaintiffs to disrupt an on-going close and important relationship in order to bring suit. Plaintiffs "could not reasonably be expected to [have] perceived the alleged violation" at the time each act occurred. *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006), *cert. denied*, 550 U.S. 960 (2007). Therefore, the continuing violations doctrine permitted them to wait until the discrimination escalated to the point where the accrued injury they suffered was reasonably apparent such that the law would expect them to act promptly in asserting their legal rights. That did not happen until Plaintiffs received notice in early December 2012 that CFSI had terminated the Franchise Agreement. This act occurred within the four-year statute of limitations period of 28

---

plaintiff knows that he has been injured, even if the plaintiff does not know that "the injury is actionable." *Fayoade v. Spratte*, 284 Fed. Appx. 345, 347 (7th Cir. 2008).

U.S.C. § 1658. Accordingly, Plaintiffs' denial of contractual benefits claim as alleged in Count III was timely filed.

### 3.   EQUITABLE ESTOPPEL.

As an alternative to finding that Plaintiffs' claims are not barred by the statute of limitations based on the accrual date for those claims, the Court also finds that there is at least a disputed issue of fact regarding whether accrual was delayed by the doctrine of equitable estoppel. "A defendant who prevents a plaintiff from obtaining information that he needs in order to be able to file a complaint that will withstand dismissal is forbidden, under the rubric of equitable estoppel, to plead the statute of limitations for the period in which the inquiry was thwarted." *Jay E. Hayden Foundation v. First Neighbor Bank, N.A.,* 610 F.3d 382, 385 (7th Cir. 2010). "Classic examples include hiding evidence, destroying evidence, or promising not to plead the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 676 (7th Cir. 2009). "Equitable estoppel springs from basic considerations of fairness, and denotes efforts by the defendant, above and beyond the wrongdoing upon which the plaintiff's claim is founded, to prevent, by fraud or deception, the plaintiff from suing in time." *Mitchell v. Donchin*, 286 F.3d 447, 450 (7th Cir. 2002) (internal quotation marks and citations omitted).

With regard Wilbern's denial of franchising opportunities claim, Wilbern testified that he continued to seek a South Side franchise leading up to and throughout the time in which he owned the Franklin Park Franchise. A reasonable factfinder could find that CFSI placed Wilbern "in an impossible position" when it

failed to definitively deny Wilbern a franchise opportunity on the South Side: Wilbern "could infuriate" CFSI by continuing to press for a South Side franchise immediately after CFSI approved it for a location in the western suburbs; he could "sue [CFSI] prematurely for discrimination"; or he could "simply forgo any remedy under" § 1981. *Stuart*, 771 F.3d at 1020 (applying doctrine of equitable estoppel to statute of limitations defense under Title VII). "By impaling [him] on this three-pronged fork," a reasonable factfinder could find that CFSI prevented Wilbern from suing within the two-year statute of limitations. *Id.*

A reasonable factfinder also could find that, while Wilbern feared CFSI's failure to approve him for a South Side franchise might be the product of discrimination, he hoped it was not. Further, a reasonable factfinder could find that CFSI purposefully fostered Wilbern's hope by failing to definitively deny the Marshfield Plaza application and leading Wilbern to believe that he was not a victim of discrimination and there was still a chance the application might be approved. *See Harris v. WGN Continental Broadcasting Co.*, 650 F. Supp. 568, 575 (N.D. Ill. 1986) (plaintiff stated a claim for equitable estoppel where he alleged his employer told him that his transfer was due to the separation of divisions and that his opportunities and earning potential would increase because "these representations could serve to conceal that [plaintiff's transfer] was discriminatory").

With regard to Plaintiffs' denial of contractual benefits claim arising out of discriminatory steering in the selection of the Franklin Park site, a reasonable

factfinder could find that Wilbern was faced with the Hobson's choice of accepting the Franklin Park location, infuriating CFSI by refusing to accept its preferred location, or again suing prematurely for discrimination. *See Stuart,* 771 F.3d at 1020. As to the other allegations in Plaintiffs' denial of contractual benefits claim, a reasonable factfinder could rely on Wilbern's testimony that, in September 2010, Craig Culver offered to guaranty a loan so that Wilbern could buy-out Milkshake's lease. There is conflicting testimony in the record regarding the circumstances of this promise, but there is sufficient evidence to support Plaintiffs' claim that the promise was made and that CFSI purposefully led Wilbern to believe the guaranty was forthcoming over an extended period of time when it secretly never intended to fulfill the promise. Assuming Plaintiffs' version of the facts, Wilbern was misled to believe that CFSI would support him with a guaranty thereby concealing from Wilbern the actual discriminatory motive behind CFSI's previous course of conduct which led to the Franklin Park Franchise's financial difficulties. *See Harris*, 650 F. Supp. at 575.

### D.   MOTION FOR SUMMARY JUDGMENT ON "ALL CLAIMS" BROUGHT BY WILBERN ENTERPRISES, LLC.

CFSI argues that it is entitled to summary judgment on all of Wilbern Enterprises' § 1981 claims because (1) there is a failure of proof on Plaintiffs' § 1981(b) claims relating to the Franklin Park Franchise;[21] and (2) Wilbern

---

[21] CFSI only argues for summary judgment against Wilbern Enterprises' Count III claim, but the Court will assume that it would make the same argument against Wilbern's Count III claim if Wilbern establishes a right to seek relief under that Count.

Enterprises is judicially estopped from asserting any of its claims against CFSI based on its failure to disclose those claims in the bankruptcy proceeding.

### 1.   FAILURE OF PROOF ISSUE.

"To establish a claim under § 1981, the [P]laintiffs must show that (1) they are members of a racial minority; (2)  the defendant had an intent to discriminate on the basis of race; and (3) the discrimination related to one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)." *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). CFSI asserts that Plaintiffs' § 1981(b) claim arising out of the Franklin Park Franchise Agreement fails under both the second and third requirements.

### a.   Intentional Discrimination

CFSI argues first that Plaintiffs have insufficient evidence that CFSI intentionally discriminated against them. The proper method in a § 1981 case for analyzing whether a defendant is entitled to summary judgment on the issue of intentional discrimination is to apply the substantive standards and methods of proof applicable to Title VII cases. *See Gonzalez v. Ingersoll Mill. Mach. Co.,* 133 F.3d 1025, 1035 (7th Cir. 1998). "A Title VII plaintiff can satisfy her burden of proof by two avenues: (1) she may present direct evidence of discriminatory intent or, because of the difficulty in directly proving discrimination, (2) she may use the indirect, burden-shifting procedure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* at 1031. CFSI by-passes this analytical framework, and instead makes only one argument. CFSI's argument is that the only evidence of

intentional discrimination in this case is evidence of disparate impact, not disparate treatment. R. 128 at 4.

CFSI bears the burden of proving that it is entitled to summary judgment as a matter of law. Having failed to present any argument or evidence analyzing Plaintiffs' discrimination claims under either the direct or indirect method of proof, CFSI's summary judgment motion must be denied. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir.) (*"*Perfunctory or undeveloped arguments are waived."), *cert. denied*, 545 U.S. 1115 (2005).

In any event, even a cursory review of the record shows that there is sufficient evidence to support a *prima facie* case of intentional discrimination. *See generally Home Repair, Inc. v. Paul W. Davis Sys., Inc.*, 2000 WL 126905, at *7 (N.D. Ill. Feb. 1, 2000) (denying summary judgment in § 1981 case where the evidence submitted by the plaintiff "create[d] a cumulative picture of discrimination from which a rational jury could find that," when the franchisor refused to consent to a transfer of one of its franchises to the plaintiff whose owner was African American, the franchisor intended to discriminate against plaintiff in violation of § 1981). Moreover, CFSI's argument that Plaintiffs cannot prove intentional discrimination because they rely on disparate impact evidence is really an evidentiary point about the statistical evidence Plaintiffs intend to submit in support of their intentional discrimination claim. That argument should be made in a motion in limine before trial, although CFSI should keep in mind that, even though disparate impact is not a valid theory in a § 1981 case, s*ee Gen. Bldg.*

*Contractors Ass'n v. Penn.*, 458 U.S. 375, 389 (1982) ("§ 1981 reaches only purposeful discrimination"), statistical evidence showing a disparate impact nonetheless *is* relevant and admissible to show intentional discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) (statistical evidence may play an important role in a pattern or practice case, even though the ultimate issue on which the plaintiff must prevail is intentional discrimination); *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 1999) ("There is no presumption that statistical evidence has no useful role to play in disparate treatment employment discrimination cases – indeed, we are hard pressed to see how anyone could take such a position consistent with the Supreme Court's guidance on the matter and this court has not done so."); *Nash v. Consol. City of Jacksonville,* 895 F. Supp. 1536, 1541 (M.D. Fla. 1995) ("Even though proof of disparate impact alone is insufficient to establish a section 1981 or section 1983 violation, disparate impact is a form of evidence with which Plaintiff can demonstrate disparate treatment. Evidence of a disproportionate impact is relevant to the question of intent since an invidious discriminatory purpose may often be inferred from the totality of the relevant facts.") (citations omitted), *aff'd sub nom., Nash v. Consol. City of Jacksonville*, 85 F.3d 643 (11th Cir. 1996).

### b.    Compliance With Franchise Agreement.

CFSI next argues that it is entitled to summary judgment on Count III because the facts are undisputed that it has complied with all provisions of the Franchise Agreement. Plaintiffs respond that there is no requirement under

§ 1981(b) that the plaintiff plead and prove a breach of contract. CFSI replies that its position is *not* that a breach of contract is a condition precedent to an actionable § 1981(b) claim. Instead, CFSI states, its position is that "the 'benefits, privileges, terms, and conditions' that Wilbern Enterprises is entitled to 'enjoy'" under § 1981(b) are "*limited* to what is contained therein." R 128 at 3 (emphasis added).

Essentially, CFSI is asking the Court to rule, as a matter of law, that a § 1981(b) defendant cannot be guilty of racial discrimination in the "benefits, privileges, terms, and conditions" of a contract if the plaintiff does not have a right under the terms of the contract to expect or demand (or, alternatively, if the defendant does not have any obligation under the terms of the contract to provide) any different treatment than what the plaintiff got. Notwithstanding CFSI's protestations to the contrary, this is just a convoluted way of saying that there has to be a breach of contract. Thus, CFSI's admission that a plaintiff does *not* have to prove "a breach of contract [as] a condition precedent to an actionable Section 1981 claim," R. 128 at 3 n.1, is fatal to CFSI's summary judgment argument.

In any event, even if CFSI could reconcile its position on this issue, its argument is contrary to the Seventh Circuit's opinion in *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827 (7th Cir. 2007). In that case, the plaintiff was a Palestinian Arab of the Muslim faith and a franchisee of Dunkin Donuts. He alleged racial discrimination giving rise to a claim under § 1981 based on Dunkin Donuts' denial of his request to relocate or renew his franchises, which denial, the plaintiff alleged, was motivated by the plaintiff's refusal to sell pork products. In its defense to the

plaintiff's § 1981 claims, Dunkin Donuts "point[ed] to the franchise agreement itself, which require[d] all franchisees to carry Dunkin Donuts' full food product line." *Id.* at 830. Dunkin Donuts further argued that the plaintiff's "refusal to carry pork products violates that provision" and "establishes that he cannot or will not perform his obligations under the contract." *Id.*

The Seventh Circuit rejected these arguments, holding that Dunkin Donuts could not rely on the literal terms of the franchise agreement to defeat the plaintiff's § 1981 claim because the plaintiff alleged that Dunkin Donuts "has never required its franchisees to carry the full product line despite that language, and in fact that it affirmatively assisted franchisees in carrying less than the full product line by providing signs for stores declaring: 'No Meat Products Available.'" *Id.* The Seventh Circuit said that evidence showing Dunkin Donuts did not enforce the contractual provision against some franchisees while enforcing it against the plaintiff was sufficient to defeat Dunkin Donuts' summary judgment motion on the plaintiff's § 1981 claim. *Id.* at 831. "[I]f Dunkin Donuts continued to allow franchisees to carry less than its full product line without consequence or any other indication that the provision was a material part of the contract, then it could hardly point to that neglected provision to defeat a claim of racial discrimination if it chose to enforce it against only certain racial minorities." *Id.* at 830. Like the plaintiff in *Elkhatib*, Plaintiffs have produced evidence "sufficient to raise an inference that [CFSI] applied its legitimate [contractual] expectations in a disparate manner." *Id.* at 831 (internal quotation marks and citation omitted). Therefore, CFSI's argument for

summary judgment on this basis is rejected.

## 2.   JUDICIAL ESTOPPEL.

The relevant facts regarding CFSI's judicial estoppel argument are undisputed. Wilbern Enterprises filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois on May 9, 2012. Wilbern Enterprises did not disclose in either its bankruptcy schedules or at any time during the bankruptcy proceedings that it had an unliquidated § 1981 claim against CFSI. The bankruptcy court dismissed Wilbern Enterprises' Chapter 11 case on October 10, 2012 upon the motion of the trustee, who argued cause to either convert or dismiss the case under 11 U.S.C. § 1112(b)(4)(A), because there was no longer a reasonable likelihood of rehabilitation after the bankruptcy court granted Milkshake relief from the bankruptcy stay to allow it to proceed with a state court eviction proceeding. By letter dated November 30, 2012 and received by Wilbern Enterprises sometime in the first week of December 2012, CFSI terminated the Franchise Agreement "effective immediately." On April 30, 2013, Plaintiffs filed the present lawsuit.

Under the heading of "judicial estoppel," CFSI actually makes two arguments — a standing argument and an estoppel argument. CFSI's standing argument is that Wilbern Enterprises' failure to disclose its § 1981 claims in its Chapter 11 bankruptcy schedules means those claims remained a part of the bankruptcy estate so that Wilbern Enterprises no longer has standing to assert them. Because CFSI failed to adequately identify this as a separate and distinct argument from its

judicial estoppel argument, and also failed to adequately develop the standing issue even within the context of its judicial estoppel argument, the Court finds CFSI has waived this ground for summary judgment. *See Estate of Moreland*, 395 F.3d at 759. In the alternative, the Court rejects CFSI's standing argument for the reasons given in *Crawford v. Franklin Credit Mgmt.*, 758 F.3d 473, 483-87 (2d Cir. 2014) (§ 554 of the Bankruptcy Code dealing with abandonment of property of the estate does not apply to a bankruptcy petition that has been dismissed pursuant to § 349 of the Code; pursuant to § 349(b)(3), a dismissal of a bankruptcy case re-vests the property of the estate in the entity in which such property was vested immediately before the commencement of the case, *i.e.,* the debtor).

On the issue of judicial estoppel, CFSI is correct that case law from this circuit (and others as well) holds that "a debtor in bankruptcy who denies owning an asset, including a chose in action or other legal claim, cannot realize on that concealed asset after the bankruptcy ends." *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006), *cert. denied*, 549 U.S. 1261 (2007) (citing case law). There are several reasons why the Court will not apply judicial estoppel in this case.

As an initial matter, the Court previously held in this opinion that Wilbern Enterprises' § 1981 claims did not accrue until CFSI terminated the Franchise Agreement. CFSI terminated the Franchise Agreement after the Chapter 11 proceedings were dismissed, so there was no bankruptcy estate in existence when the claims came into existence. Like CFSI's statute of limitations arguments, CFSI's judicial estoppel argument fails to distinguish between Wilbern's knowledge of a

legally cognizable claim and Wilbern's knowledge of events or conduct on which a future claim of discrimination might later be based. Regardless of the fact that Wilbern was aware of some of the acts or conduct on which Wilbern Enterprises' claims are based when Wilbern Enterprises filed its bankruptcy schedules, those acts and conduct had not yet ripened into a legal cause of action. So there was nothing for Wilbern Enterprises to disclose. *See Yapp v. Astellas Pharma Global Dev., Inc.* 2015 WL 1326371, at *3 (N.D. Ill. Mar. 20, 2015) (debtor "has no obligation to include in her schedule of contingent and unliquidated claims a cause of action that had not yet accrued as of the bankruptcy filing date") (citing *Cusano v. Klein*, 264 F.3d 936, 948 n.5 (9th Cir. 2001)). [22]

In any event, judicial estoppel only applies where the omission is intentional. *See Metrou v. M.A. Mortenson Co.*, 781 F.3d 357, 360 (7th Cir. 2015) ("When as in *Cannon-Stokes* a debtor stubbornly tries to cut out the creditors, then the claim is gone forever."). The requisite intent cannot be inferred from the mere fact of nondisclosure. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 364 (3d Cir. 1996) ("policy considerations militate against adopting a rule that the requisite intent for judicial estoppel can be inferred from the mere fact of nondisclosure in a bankruptcy proceeding"). Some omissions "will be innocent —

---

[22] In the cases CFSI cites, it was clear that the claims had accrued and that the debtor knew about them at the time the debtor failed to disclose them. *See Cannon-Stokes,* 453 F.3d at 447 (debtor was pursuing an administrative claim for $300,000 against the Postal Service at the same time as she filed a Chapter 7 bankruptcy petition that did not disclose the administrative claim); *Thompson v. O'Bryant*, 2008 WL 1924954, at *1 (N.D. Ill. Apr. 30, 2008) (debtor prepared a five-count lawsuit asserting his claims five days prior to filing for bankruptcy and then filed the lawsuit in state court weeks after his Chapter 13 bankruptcy case was dismissed).

based on poor communication between bankruptcy counsel and tort counsel, or based on a belief that the tort claim will not be valuable — and should not be punished." *Metrou,* 781 F.3d at 360; *see New Hampshire v. Maine*, 532 U.S. 742, 753 (2001) ("We do not question that it may be appropriate to resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake.") (internal quotation marks and citation omitted). In light of all the circumstances shown in the record, including on-going communications between Wilbern and CFSI during the pendency of the bankruptcy, even if Wilbern Enterprises' § 1981 claims were or came into existence before the bankruptcy was dismissed, there is no evidence that the omission of those claims from Wilbern Enterprises' bankruptcy schedules was an intentional act done with the purpose of obtaining an unfair advantage or benefit. *See Spaine v. Community Contacts, Inc.,* 756 F.3d 542, 547 (7th Cir. 2014) (judicial estoppel does not apply where there was no basis for inferring that the debtor deliberately concealed her claim from the bankruptcy trustee and her creditors).

CFSI's primary contention appears to be that Wilbern Enterprises gained an unfair advantage from not having disclosed its § 1981 claims. But the Court cannot imagine what that advantage might be. Certainly, CFSI was not prejudiced. Nor did Wilbern Enterprises receive an undeserved benefit. The bankruptcy proceedings were dismissed on motion of the trustee without Wilbern Enterprises receiving a discharge of any debts. CFSI asserts that, "had the potentially valuable claim been disclosed, the trustee may very well have recommended converting the bankruptcy case to a chapter 7 case as opposed to dismissing the case altogether." R. 128 at 10.

From the Court's review of the bankruptcy file, however, the trustee's motion did seek the alternative relief of conversion. Whether the trustee failed to "recommend" that option outside of its motion is not reflected in the record. Similarly, whether a creditor might have objected to dismissal and sought conversion to a Chapter 7 dissolution instead, also is outside the record. Without any factual development of these arguments, it is speculation to assume disclosure of Wilbern Enterprises' § 1981 claims against CFSI would have been significant to a decision to convert Wilbern Enterprises' Chapter 11 reorganization to a Chapter 7 liquidation. It also makes no sense to assume, as CFSI does, that dismissal as opposed to conversion gave Wilbern Enterprises an "unfair advantage." If Wilbern Enterprises were to recover on its § 1981 claims, its creditors would be free to seek collection of any debts still owed to them directly from Wilbern Enterprises without having to proceed by way of filing a claim in a Chapter 7 case. Thus, if the Court were to speculate on this issue, it would have to assume that Wilbern Enterprises' creditors were in a better not worse position from Wilbern Enterprises' bankruptcy petition having been dismissed rather than converted.[23]

---

[23] Inexplicably, CFSI states that "Wilbern Enterprises obtained a benefit from its failure to disclose because it is now able to assert the potentially valuable claim in this litigation (and retain any recovery entirely for its own benefit), free and clear of the numerous creditors' claims that were listed in the bankruptcy case who otherwise would have been entitled to that recovery had the claim been disclosed and had the case been kept in bankruptcy." R. 128 at 12. This is a bold and completely unsupported and unsupportable statement for CFSI to make. Wilbern Enterprises did not receive a discharge. Therefore, dismissal of the Chapter 11 proceedings did not affect the rights of any of its creditors insofar as Wilbern Enterprises' assets are concerned. There is absolutely no basis for CFSI to say, as it does, that Wilbern Enterprises "dodged its creditors." *Id.* The Court expects a great

### D.   *Motion for Summary Judgment On Lost Profits.*

CFSI moves for summary judgment on Plaintiffs' damages claims for lost profits arising out of (1) potential franchising opportunities, and (2) the Franklin Park Franchise.

### 1.   Lost Profits From Potential Franchising Opportunities.

#### a.   The "New Business" Rule.

CFSI argues that Plaintiffs may not recover lost profits damages arising out of any of the three potential franchising opportunities for which Plaintiffs seek recovery as outlined in Gordon's expert report. According to CFSI, such damages are not recoverable as a matter of law pursuant to the "new business rule."[24] The new business rule bars recovery of "expected profits of a new commercial business" because they "are considered too uncertain, specific and remote to permit recovery." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007).

Plaintiffs rely primarily on *TAS Distributing*, a case applying Illinois law.[25] It is not clear whether *TAS Distributing* considered Illinois law absolute on the issue

---

deal more candor from litigants than what CFSI's statements on this issue reveal.

[24] In its reply brief, CFSI denies advocating a ruling, as a matter of law, against recovery of lost profits by a new business, but the arguments made in its opening brief show otherwise.

[25] Plaintiffs also cite to *Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995), which references the rule without any analysis, and *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554, 557 (N.D. Ill. 2008), which itself relies on *TAS Distributing*.

of whether lost profits can ever be recovered by a new business.[26] But assuming it did, more recent Illinois law reflects a more flexible approach. *See Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 407 (Ill. 2006) ("There is no inviolate rule that a new business can never prove lost profits."); *Apa v. Nat'l Bank of Commerce*, 872 N.E.2d 490, 493 (Ill. App. 2007) ("Lost profits may be recovered when there are *any* criteria by which the probable profits may be estimated with reasonable certainty.") (emphasis added).

Moreover, while the Court may look to state law for guidance on general tort principles, federal law is controlling in a § 1981 case. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969) ("[c]ompensatory damages for deprivation of a federal right are governed by federal standards") (citing 42 U.S.C. § 1988). Applying general tort law principles, the Seventh Circuit analyzed the new business rule and rejected it. *See MindGames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 657 (7th Cir. 2000) ("The 'new business' rule is an attempt now widely regarded as failed to control the award of [lost profits] damages by means of a rule. The rule doesn't work because it manages to be at once vague and arbitrary."), *cert. denied*, 531 U.S. 1126 (2001). Instead of a "flat prohibition against awarding damages" for lost profits of a new business, the Seventh Circuit has held that courts should apply "the general standard governing proof of damages, which requires a plaintiff to make a reasonable estimate of its damages as distinct from relying on hope and a guess."

---

[26] To the extent *TAS Distributing* has been interpreted this way, other courts have noted that its analysis of Illinois law is "far from convincing." *H.B. Williamson Co. v. Ill-Eagle Enters., Ltd.*, 2015 WL 802250, at *6 (S.D. Ill. Feb. 25, 2015).

*Parvati Corp. v. City of Oak Forest*, 709 F.3d 678, 685 (7th Cir. 2013); *see also MindGames, Inc.*, 218 F.3d at 658 ("courts have become sufficiently sophisticated in analyzing lost-earnings claims, and have accumulated sufficient precedent on the standard of undue speculativeness in damages awards, to make the balance of costs and benefits tip against the rule"). Therefore, Plaintiffs' damages claims to recover lost profits from other franchising opportunities is not barred by the new business rule.

### b.   Lost Profits From Stony Island And Marshfield Plaza.

CFSI also argues that Plaintiffs' evidence of lost profits is insufficient to support their recovery here. Generally, there is no one method by which a plaintiff must establish lost profits with reasonable certainty. In the franchise context, however, courts have held that historical data from franchise operations can be a proper yardstick for losses sustained by a potential franchisee who was prevented from going into the franchise business by the wrongful conduct of the defendant. *See, e.g., FMS, Inc. v. Volvo Constr. Equip. N.A., Inc.,* 2007 WL 844899, at *10 (N.D. Ill. Mar. 20, 2007) ("courts are willing to entertain lost profit calculations based upon historical data from franchise operations, even when those calculations also included the business owner's assumptions, and sometimes, when the business had not yet begun operation"); *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 629 (Tex. App. 1996) (damage model presented by expert, which took into account historical operations of Popeye's franchises, the potential for failure of a new franchise and the factors upon which he based his evaluation of the likelihood

of the plaintiff's success, including the plaintiff's experience in the industry, provided "an intelligent objective basis" for plaintiff's damages); *No Ka Oi Corp. v. Nat'l 60 Minute Tune, Inc.*, 863 P.2d 79, 83 (Wash. App. 1993) ("proof of the nationwide character of the franchise business at issue provided an ample basis for computation of probable losses"), *rev. denied*, 877 P.2d 1287 (Wash. 1994); *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky. 1985) (adequate yardstick for lost profits calculations provided by data from a "national franchisor, with uniformity of national advertising, uniform quality control, earnings and expense figures on nearby and comparable locations, and an available history concerning success and failure ratios"); *Smith Dev. Corp. v. Bilow Enters., Inc.*, 308 A.2d 477, 482-83 (R.I. 1973) (trial court erred in refusing to allow expert testimony regarding sales of other McDonald's restaurants in the area as basis for estimating plaintiff's lost profits for a McDonald's that did not open because of defendants' wrongful conduct).

CFSI distinguishes these cases by saying all but one are from outside this jurisdiction, but does not otherwise offer any reason to question the persuasiveness of the analysis or validity of the conclusions reached by those courts. CFSI also does not attempt to challenge Plaintiffs' ability to present evidence of lost profits for the potential franchises at Stony Island and Marshfield Plaza using sales and costs figures from other Culver's restaurants in comparable geographic locations. Instead, CFSI repeats the arguments it made for excluding Plaintiffs' expert testimony

regarding those two locations.[27] The Court already has addressed those arguments in its discussion of CFSI's *Daubert* motion. The same analysis applies here. Accordingly, CFSI is not entitled to summary judgment on Plaintiffs' lost profits claims arising out of potential franchises at Stony Island and Marshfield Plaza.

### c.   Lost Profits From Chatham Market.

CFSI's arguments regarding Wilbern's lost profits damages claim arising out of a potential franchise at Chatham Market presents a slightly different issue. That claim is one level removed from Plaintiffs' other lost profits damages claims. Gordon theorized that Wilbern would have opened the Chatham Market franchise as a result of the success he would have achieved had he been allowed to open the Marshfield Plaza franchise.

Despite the additional assumption underlying this lost profits claim, the same general tort principles govern. *See* RESTATEMENT (SECOND) OF TORTS § 910 (1979) ("One injured by the tort of another is entitled to recover damages from the other for all harm, past, present and prospective, legally caused by the tort."); RESTATEMENT (SECOND) OF TORTS § 912, comment d ("When the tortfeasor has prevented the beginning of a new business or the prosecution of a single transaction, all factors relevant to the likelihood of the success or lack of success of the business or transaction that are reasonably provable are to be considered, including general business conditions and the degree of success of similar

---

[27] CFSI also challenges other evidence on lost profits under Federal Rule of Evidence 401. CFSI's Rule 401 arguments, however, are more appropriately raised at trial or by motion in limine prior to trial.

enterprises."). Nevertheless, this once-removed damages claim involves a greater concern that the likelihood of lost profits is too remote and speculative. *See id.* ("Because of a justifiable doubt as to the success of new and untried enterprises, more specific evidence of their probable profits is required than when the claim is for harm to an established business.").

Although some leeway in proof as to the amount of damages is allowed to a plaintiff who has suffered a wrong, "at some point too many inferences become mere speculation" and damages must be precluded. *Mid–Am. Tablewares, Inc.,* 100 F.3d at 1368 (quoting *Roebuck v. Drexel Univ.*, 852 F.2d 715, 736 (3d Cir. 1988))*; see also MindGames, Inc.,* 218 F.3d at 658 ("a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate"). Plaintiffs have not cited any case law where recovery of lost profits was allowed in a once-removed situation like this. Because the issue has not been adequately explored on the current motions, the Court will reserve judgment on it at this time. The parties may provide the Court with a supplemental memorandum of law limited to five pages on this issue, to be filed before the final pretrial conference. In addition, Plaintiffs may consider whether an offer of proof through their expert will be useful in resolving this issue.

### 2. LOST PROFITS FROM FRANKLIN PARK FRANCHISE.

CFSI's arguments regarding lost profits from the Franklin Park Franchise are repetitive of the arguments it makes in its motion to strike Gordon's expert testimony on that issue. Because the Court denied CFSI's motion to strike Gordon's

testimony, CFSI is not entitled to summary judgment on Plaintiffs' damages claim for the recovery of lost profits from the Franklin Park Franchise. However, the Court notes that the undisputed evidence in the record is that Plaintiffs were seeking only a single franchise in the 2002-2005 time-period. Further, Plaintiffs contend that they ended up at the Franklin Park location only as a result of having been steered away from the Stony Island location. Therefore, damages measured by the lost profits at a potential franchise at Stony Island would appear to be duplicative of lost profits damages from the Franklin Park Franchise. If Plaintiffs wish to present evidence on both, they must reconcile their damages claims for this time-period so as to avoid double recovery.

### E. MOTION FOR SUMMARY JUDGMENT ON CFSI'S COUNTERCLAIM FOR BREACH OF CONTRACT AND BREACH OF PERSONAL GUARANTY.

CFSI's final motion seeks summary judgment on CFSI's counterclaims against Plaintiffs to recover royalties allegedly owed by Plaintiffs under the Franchising Agreement and Wilbern's guaranty. Plaintiffs do not contest the fact that they fell behind on royalties and are not contesting CFSI's calculation of the amount of its claim. Therefore, the amount claimed by CFSI may be treated as an established fact that CFSI will not have to prove at trial.

Entry of summary judgment in favor of CFSI on its counterclaims, however, would be inappropriate at this time. Disputed issues of fact exist on Plaintiffs' affirmative defenses to CFSI's counterclaims, which include fraudulent inducement and breach of the covenant of good faith and fair dealing. In addition, disputed issues of fact exist on CFSI's affirmative defense of a set-off based on damages

Plaintiffs seek to recover on their § 1981 claims. Therefore, summary judgment on CFSI's counterclaims is denied.

## CONCLUSION

For the foregoing reasons, the Court denies the following motions: (1) CFSI's Motion to Strike Plaintiff Wilbern's Affidavit, R. 131; (2) CFSI's Motion to Strike Plaintiffs' Expert John A. Gordon, R. 122; (3) CFSI's Motion for Partial Summary Judgment on Time-Barred Claims, R. 99; (4) CFSI's Motion for Summary Judgment On Plaintiffs' Claims for Lost Profits, R. 123; and (5) CFSI's Motion for Summary Judgment on CFSI's Counterclaim for Breach of Contract and Breach of Personal Guaranty, R. 96.

CFSI's Motion for Summary Judgment on All Claims Brought by Wilbern Enterprises, LLC, R. 102, is granted in part and denied in part, with the Court dismissing Wilbern Enterprises' claims in Count II only.

In addition, Plaintiffs shall file a position statement not to exceed 5 pages within 7 days from the date this Order is entered stating whether Wilbern intends to pursue a claim under Count III based on his guaranty. If Wilbern does intend to pursue such a claim, Plaintiffs' position statement shall provide appropriate argument and citation of authority to support Wilbern's legal right to pursue such a claim. CFSI may file a response, also limited to 5 pages, within 7 days after Plaintiffs' position statement is filed.

A status hearing is set for October 21, 2015 at 9:00 a.m. Counsel should be prepared to discuss the expected length of trial, and their own trial schedules, as

a firm trial date will be set at the status conference.

ENTERED:

Thomas M. Durkin
United States District Judge

Dated: September 29, 2015